Booth, Chief Justice,
delivered the opinion:
The plaintiff entered into a written contract on December 8, 1924, to construct for the defendant a subterranean tunnel. The tunnel when completed was to be about 8,600 feet in length, 6 feet in diameter inside measurement, and was located 40 feet beneath the surface of the earth. Construction work was to be completed within 24 months from December 24, 1924, and payment for performance was to be made upon a unit price basis. During the course of performance innumerable disagreements arose between the contractor and the Government officials in charge of the work, much ill feeling obtained, and the record is replete with charges and countercharges respecting the efficiency and honesty of the contractor and the Government inspectors. In fact, this unfortunate situation makes it difficult to reconcile an acutely disputatious record, and from the standpoint of fact ascertain accurately as to the right. The suspicions of the inspectors may have rendered them at times unduly prejudiced and too willing to ascribe evil motives to the contractor; in fact, this very situation brought about or occasioned discord among the inspectors themselves. On the other hand, the contractor’s entertainment of disrespect for the inspectors and their ability may have led to a course of conduct where accusations of mistakes were not justified.
We have gone carefully over the entire record and from it deduced the findings made. The first item in suit consists of a claim for dry packing and filling the dry pack with grout. Dry packing is a process resorted to in order to fill up existing space or cavities. Eocks of a prescribed size are compactly placed in the cavities in sufficient quantity to fill *79 the space, and thereafter grouted, i.e., a composition of cement, sand, and water, known as grout, is pumped into and upon the rocks so as to completely fill up the voids and open spaces appearing necessarily in the rock packing. This form of construction serves to produce a solidified mass affording substantial support from the pressure and weight of the earth material from above.
Paragraph 58 of the specifications provided in part as follows:
“ 58. Excavation in twrmel and end structures. — The excavation under this section includes all the work of this class necessary in the tunnel and for the end structures as shown on the drawings. The excavation in the tunnel shall be made within the prescribed limits as shown on the drawings and as described in these specifications. The contractor shall make all excavation in the tunnel in accordance with reference lines £A’, 1B ’, and 1 C ’ as shown on the drawing and described in paragraph number 33 but with the understanding that no excavation removed beyond the ‘ B 5 line will be paid for.”
The “A” line indicates the minimum thickness of concrete that made up the tunnel proper, and the “ B ” line, extending six inches beyond the walls of the tunnel, was the outer limit of excavation; any excavation made beyond the “ B ” line was to be at the contractor’s expense. In other words, for pay purposes, the “ B ” line limited the size of the “ hole ” into which the tunnel was to be constructed. In excavating this prescribed area the contractor necessarily produced excess excavation, i.e., of course it was physically impossible to excavate so as to prevent cavities beyond the “ B ” line and prevent materials from falling in from the sides of the excavation. The contractor was well aware of this fact and obligated himself to remove without pay all such excess excavation. For the purpose of reckoning pay the “ B ” line is one of primary importance. Paragraph 62 of the specifications is as follows:
“ 62. Dry packing and grouting in twrmel. — No dry packing will be allowed except where necessary over the crown of the tunnel arch, in which case clean, sound stones shall be used for packing and the spaces between such packing *80 shall be thoroughly filled with grout, pumped into place, consisting of 1 part of portland cement and 2 parts of fine building sand mixed with a suitable amount of water.
“ Dry packing will be paid for by the cubic yard at the price bid by the contractor, the actual amount being determined by measuring the spaces so filled.
“ Grouting will be paid for by the number of bags of cement used in the grout, pumped into place and at the price bid by the contractor.”
In constructing the side walls, as well as the arch of the tunnel, cavities were left beyond the “ B ” line, and these voids or vacant spaces give rise to the controversy over this item in suit. Preliminary borings made by the Government officials indicated the character of materials to be excavated and it was known by the parties to the contract that a portion of the tunnel would pass through rock and another portion through soft earth. In. what was known as the “ rock section ” no timbers were to be used to support the excavated portion, the solidity of the rock being relied upon for this purpose. In the soft earth section timbers of prescribed dimensions were to be employed to support the excavation, and this portion of the work was known as the “timbered section.” The contractor, with respect to the “ timbered section ”, was ordered to dry pack and grout over the crown of the arch of the tunnel. He did dry pack the cavities over the crown of the arch, and into this dry packing as placed, pumped grout which consumed 13,891 bags of cement. He was not paid for anywhere near this amount of cement, and claims pay for the difference between the payments made to him and what he alleges he should have received under the contract at the rate of $3.00 per bag. The issue narrows under the contract and record in the case to the accuracy and correctness of measurements made to ascertain the amount of grout which should be paid for under the contract. Specification 62, quoted above, clearly contemplated the use of dry packing and grout if, in the opinion of the Government officials, it became necessary. There was no obligatory provision with respect to its use; if it was used the specification provided a basis of payment therefor. The question of the quantity of dry pack and *81 grout and the method of ascertaining the same are fixed in specification 62. Where it was to be used was also fixed, but discretion as to its user was reposed by the contract in the supervising officials of the Government. Paragraph 21 of the contract exacted the approval of the contracting officer of the order of work adopted by the contractor. As previously observed, line “ B ” was by the drawings and plans extended around the concrete walls of the tunnel 6 inches from the same. When it came to dry packing and grouting the cavities over the crown of the tunnel arch the contractor inserted pipes in the center of the arch and along the side walls of the tunnel which extended some 4y2 or 5 feet above the arch through which he intended to pump grout therein. The contracting officer declined to approve this method and ordered the pipes to extend no farther than 6 inches above the crown of the arch, evidently believing that no contract authority appeared to do otherwise. Subsequently it was discovered that grouting the dry pack to the extent of 6 inches only would not accomplish the desired purpose and the contractor was ordered to dry pack and grout by extending his pumping pipes to substantially the same elevation he originally employed, and at the same time he was expressly told and the information was expressly repeated that in making payments for dry packing and grouting the same would be limited to an area defined by “ B ” line extended vertically from the side walls of the tunnel to an elevation disclosed as 325. It is doubtful whether the contracting officer had a right to extend the “ B ” line vertically over the crown of the arch; nevertheless, it was done. It was not only done, but a drawing of the area disclosing the method of payment was shown the contractor and he was definitely made acquainted with the fact that no payments would be made to him except in accord with this method. Notwithstanding this positive and advance information, the contractor proceeded in accord with his individual construction of the contract terms, dry packed an area over the crown of the tunnel arch which extended beyond the vertical “ B ” line extended, and pumped into it the large amount of grout sued for, the contractor insisting that under the *82 contract he was entitled to pump grout into the designated dry packing irrespective of whatever places or cavities it might percolate into and fill up, either in the dry packing or cavities, over the crown of the tunnel arch, or beyond the “ B ” line in the side walls. To the contracting officer he insisted that the contract having limited his pay for excavation to the “ B ” line, it was the intention of the parties that he should be paid for removing excess excavation beyond the “ B ” line by being allowed to fill the spaces resulting therefrom with grout. Obviously in this respect the contractor was in error and the position taken is untenable; at least we are unable to find any provisions of the contract which warrant such a construction, and we cannot go beyond the terms of the contract. Excess excavation was not to be paid for and there is no provision of the contract by the terms of which the cavities left by excess excavation were to be filled at Government expense. The fact that dry packing was limited to over the crown of the arch, and then only when necessary, was in itself sufficiently explicit to notify intending bidders that that space and that alone was available for dry packing and grout. Any other construction of the contract would, it seems to us, involve a writing into the contract and specifications that all cavities due to excess excavation beyond the “ B ” line would be filled with grout and be paid for by the Government. The contracting officer measured the space between the vertical lines “ B ” extended and ascertained the cubic contents of the area between these lines and elevation 325, and the contractor was paid for the amount of grout which should have been sufficient to thoroughly grout the dry pack therein. He was not paid for the grout which found its way into other cavities and voids not over the crown of the arch, which, in view of the great amount of cement used, must have been numerous.
The plaintiff challenges both the method of computation and the limitation of the area and contends that inasmuch as he was required to dry pack and grout over the crown of the arch he was in nowise responsible for grout which went into other spaces. We find it impossible to sustain this contention. A specified and limited area was to be dry *83 packed and the dry pack in that area thoroughly grouted, and if the contractor by excess excavation elsewhere left cavities which, because of their existence, imposed upon him the necessity for using much more grout than the dry packing normally exacted, it was not the fault of the Government. The condition should have been corrected before the grout was used. We cannot conclude from the record that grouting vacant spaces and voids, other than sufficient grout to fill the voids in the dry packing itself was to be paid for. To so hold would require a finding that outside the outer lines of the tunnel grouting was to be allowed until the entire area excavated should be filled with grout. An order to dry pack and grout is not alone sufficient to attach liability to the Government for so doing. The work of dry packing and grouting must be performed under the terms of the contract and in connection with an existing situation, and the facts conclusively show that the contractor was expressly notified as to what was expected of him and the payment which would be made for the work. We say this because both the written and oral testimony establish beyond doubt that the contracting officer, as well as the Chief of Engineers, took this position and notified the contractor. The contractor must have known that he was accepting the hazard of great loss in this respect, for his monthly estimates of the use of cement upon which his pay therefor was predicated were so decidedly at variance with his claims, and he was being paid so little in comparison with his claims, that prudence warned him to discontinue until the issue was adjudicated and settled. It is true that the area over the crown of the tunnel arch which he dry packed and grouted extended outside the “ B ” lines and possibly above elevation 325, and if facts were available to establish with reasonable certainty the amount of cement required to thoroughly grout this area, the plaintiff might recover for this excess of dry packing and grouting, but the record does not supply the facts.
In our view of the contract provisions with regard to dry packing and grouting, the plaintiff is entitled to recover for the quantity of grout essential to fill in the voids in the dry *84 packed area, but he is not entitled to be paid for cement used in making grout on the basis of the quantity he pumped into the dry pack, irrespective of whether such grout was required to accomplish that purpose or not. The plaintiff was obligated to construct the tunnel in a workmanlike manner; the lines defining its dimensions and providing pay for excavation were clearly set forth and fully understood. When the plaintiff exceeded these lines the responsibility was his except insofar as the contracting officer may have determined it necessary to dry pack and grout, and we state this with some hesitancy, for the contract and specifications are clearly susceptible to a construction that no authority existed to pay for any work outside the area fixed by the contract and specifications. It is doubtful if dry packing and grouting were to be done at all at the Government’s expense outside the “ B ” lines. However, the parties construed the contract as authorizing it in case of necessity. The work was done in pursuance of this construction and the Government received the benefit, but it was not the intention or purpose, and the specifications do not warrant such a course, to allow the plaintiff to supply a quantity of grout in the dry pack vastly greater in quantity than sufficient to, grout the dry-packed area, much of which it is conceded went into and filled up spaces wholly disconnected from the dry-packed area.
It was not originally intended to do any dry packing and grouting in the rock section of the tunnel. The contracting officer construed the contract to require the contractor to concrete to the side walls of the excavation. The drawings and plans required him to concrete to line “ B.” A controversy arose over this question and the contracting officer agreed that instead of concrete the contractor might use dry pack and grout, which were less expensive, offering at the time to obligate the Government to pay one-third of the expense of so doing. The matter reached the Chief of Engineers on appeal to him, and the decision of the engineer is set forth in the findings. This decision of the engineer was rested upon a letter from the contractor and reports from the contracting officer in reference to what had been done previous *85 to the appeal. The letter repudiates the offer to pay one-third of the expense but does order the dry packing and grouting, and as we have held, if the facts disclosed the quantity of grout sufficient to grout the area dry packed, we think a judgment for the same predicated, upon the number of bags of cement used could be awarded. However, what we have said with reference to this matter as to dry pack and grout in the timbered section applies with equal force to the rock section.
The record furnishes a basis of computation offered by the plaintiff evolved from the quantity of stone and grout used in filling up the cavities. The basis suggested is what is designated as the liquid method. It is conceded that within a given dry packed area 40 or 42% of the space dry packed will be occupied by voids, i.e., vacant spaces between the rocks used, and that one bag of cement in conjunction with the proportion of sand and water essential to be used in making grout, will result in 2.62 cubic feet of grout. Therefore, by multiplying this figure by the number of bags of cement actually used and dividing the result by 42 and then by 27, the number of cubic feet in a cubic yard, you accurately ascertain the volume of dry-packed space. By employing this formula the contractor insists the dry-packed space totaled 5,561 cubic yards, a total space far in excess of what the Government officials ascertained and paid for as existing over the crown of the tunnel arch. The liquid method resorted to by the contractor is fundamentally predicated upon the quantity of grout used, disregarding the fact that much of the grout was not required to grout the dry pack and found its way into cavities outside the area to be grouted, for the grouting of which the Government was in no way responsible, and no order to grout the same had been or could have been authorized under the contract. We find no evidence in the record warranting a finding that the contracting officer contemplated the grouting of any existing cavities except those over the crown of the tunnel arch, and the contract and specifications exhibit no provisions obligating the Government to assume a liability for correcting whatever may have been the results of excess *86 excavation beyond tbe “ B ” lines, except as disclosed by specification 62, and even with respect to this specification we entertain serious doubts as to whether it authorized dry pack and grout beyond the “ B ” lines. It is not sufficient to answer the contention of the Government, as to pay for dry packing and grout being limited to the area dry packed and grouted, that the contractor was not concerned with the question of where the grout pumped into the dry pack found lodgment. Assuredly the contractor was required to dry pack and grout, but the plans and specifications pointed out specifically what area was available for the purpose, and if the contractor by excess excavation created a condition precluding him from performing the work and thereby exacting an excessive use of cement to do it properly, the Government may not be held liable for the same.
The next item in suit is for dry packing the space over the crown of the tunnel arch. The plaintiff, as we have previously observed, claims he dry packed a total area of 5,561 cubic yards ascertained, as pointed out hereinbefore, by the liquid method. We have said that the plaintiff might recover for the total area dry packed and grouted. The obstacle in the way is the lack of proof defining the extent of space dry packed.
The contractor alleges a damaging interference with his plans and equipment for dry packing and grouting. The record establishes the fact that the contractor had made essential preparations for dry packing and grouting. He had been dry packing the space over the crown of the tunnel arch in the timbered section of the tunnel as the work of excavating proceeded, and the method had the approval of the contracting officer. As pointed out in the findings and heretofore commented upon, the contractor had provided necessary pipes in the concrete tunnel to pump grout into the dry pack, and had in addition installed adequate facilities for performing as well as expediting the work. When the final order was issued requiring the dry packing and grouting of the spaces over the crown of the tunnel arch, the contracting officer compelled the contractor to materially alter his plans, procure new equipment, and substitute new *87 piping for that already in use, with the result that the contractor was not only delayed in the performance of the contract, but was put to considerable expense in complying with the order. The contractor’s original equipment was sufficient to perform the work, and his plans were approved. No objection had been interposed to his equipment and nothing appears of record to warrant a finding that the new equipment installed served to effect either better or more expeditious performance of the contract.
Article 2 of the contract provided for inspection of materials and work done under the contract and authorized rejection if compliance with the contract and specifications did not obtain. As to this item, which was in no way a change under the contract, it was not within the power of the contracting officer to change the approval theretofore granted to the contractor’s plans and equipment, and thereafter exact of him an entire reversal of the situation, which it is proven in no way was essential or necessary. We set out in the findings the items we think allowable under this item in suit, which total the sum of $13,290.22. What the contracting officer did in this respect was not a change under the contract, but an enforced substitution of method and equipment for a method and equipment theretofore approved and sufficient to do the work, a substitution in nowise attributable to the contractor and not authorized under the contract.
The contractor insists upon a claim for damages predicated upon alleged interferences which prolonged the completion of the work beyond the contract period. Article 5 of the contract is in terms as follows:
“Aehole 5. If the contractor shall fail to deliver the material or to prosecute the work covered by this contract so as to complete the same within the time agreed upon, then, in lieu of taking the work out of the hands of the contractor as provided in article 4 of this agreement, the contracting officer, with the prior sanction of the Chief of Engineers, may waive the time limit and permit the contractor to finish the work within a reasonable period, to be determined by the contracting officer. Should the time limit be thus waived, all expenses for inspection and superintendence *88 after the date fixed for completion, including all necessary traveling expenses connected therewith, and all other actual losses and damages to the United States due to the delay beyond the time originally set for completion, shall be determined by the contracting officer and deducted from any payments due or to become due the contractor: Provided, however, That no charge for inspection and superintendence shall be made for such period after the date fixed for completion of this contract, as, in the judgment of the contracting officer, approved by the Chief of Engineers, shall equal the time which shall have been lost through any cause for which the United States is responsible, either in the beginning or prosecution of the work, or in the performance of extra work ordered by the contracting officer, or on account of unusual freshets, ice, rainfall, or other abnormal force or violence of the elements, or by strikes, epidemics, local or State quarantine restrictions, or other unforeseeable cause of delay arising through no fault of the contractor, and which actually prevented such contractor from delivering the material or commencing or completing the work within the period required by the contract. The findings of the contracting officer, approved by the Chief of Engineers, shall be accepted by the parties hereto as final. But such waiver of the time limit and remission of charges shall in no other manner affect the rights or obligations of the parties under this contract, nor be construed to prevent action under article 4 hereof in case the contractor shall fail, in the judgment of the contracting officer, to make reasonable and satisfactory progress after such waiver of the time limit.”
The contractor did not complete the work within the contract period. The record with respect to this issue is decidedly contradictory. Undoubtedly a considerable portion of the delay is not attributable to the Government officials. A contractual right existed upon the part of the contracting officer to interfere insofar as delays may relate to inspections and approval of work done and plans for doing the same. There is nothing in the record sustaining a finding that the contractor was uniformly right and the contracting officer always wrong in this regard, and it is impossible from the facts to find as a fixed fact that the contractor would have completed the work on time if allowed his uninterrupted way. It is true that arbitrary interference is alleged, and as to one item (finding XII) sustained, *89 but it is also true that the contractor was called upon by inspectors to do work which exacted additional time, who' discovered both omissions and faulty construction, and to his credit he corrected the same willingly. Many complaints were made as to the contractor’s tardiness in doing the work, and it is impossible from the record to charge all the delay to the defendant and ascribe none to the contractor.
Paragraph 36 of the specifications relating to materials to be used is as follows:
“ 36. Materials to be satisfactory. — All materials furnished for carrying out the contract shall be of the best quality and of the character required by the specifications. Where no standard is specified for such materials they shall be the best of their respective kind. The contractor shall, at his expense, immediately remove any unsatisfactory materials whenever discovered and shall replace them to the satisfaction of the contracting officer whenever notified by the latter to do so. * * * ”
Paragraph 37 specifies the right of the contracting officer with relation to defective work; its provisions are as follows:
“ 37. Defective work. — Neither the inspection nor supervision of the work, nor the presence of any employees of the contracting officer during the execution of any work shall relieve the contractor of any of his obligations to fulfill his contract or to perform his work to the lines, grades, etc., given by the contracting officer or his representatives. Defective work shall be made good notwithstanding that such work may have been previously overlooked by the contracting officer or his representatives and accepted and paid for.
“ If the work or any part thereof shall be found defective at any time before the final acceptance of the whole work, the contractor shall forthwith make good such defect in a manner satisfactory to the contracting officer.”
There was discovered subsequent to the completion of the tunnel a considerable number of leaks in the same. Doubtless they were due in a large measure to outside pressure. This fact, however, we deem immaterial. The tunnel was to be used for the transportation of water for the District of Columbia and in the very nature of things should not have leaked. The contractor was required by the contracting officer to correct this situation, which he did. Claim is now *90 made under this item for $2,500 for doing this work, and the right to recover is placed upon the proven fact that the concrete which went into the tunnel was mixed and placed by the contractor under the supervision and approval of the contracting officer and hence met the requirements of the specifications. Paragraph 37, quoted' above, we think, precludes an allowance for the loss claimed. This paragraph, in conjunction with paragraph 36, is, we think, sufficient in terms to impose upon the contractor the responsibility of correcting any part of the work found to be defective.
Paragraph 58 of the specifications provides in part as follows:
“ Where it is necessary to support the excavation in the tunnel and when required by the contracting officer, the contractor shall do all timbering necessary to protect the excavation until after the concrete masonry lining has been placed, but so far as practicable the timbering and lagging in the tunnel shall be removed before the placing of the concrete lining. All timber placed in the tunnel shall be of good sound quality and of a kind and size suitable for the work. Timbering shall be done in a workmanlike manner and so as to best fulfill the requirements of the particular work in which it is used. The contractor will be allowed considerable latitude in the method of timbering, but it must be of ample strength to be entirely safe and also such as to meet the approval of the contracting officer. The contractor will not be relieved, however, of entire responsibility for any damage or accident caused by failure of the timber-ing in any case.
*****
“ The material and labor for timbering in the tunnel will be furnished by the contractor and paid for as such in place for the amount actually used in feet board measure, at the price bid by the contractor.
“ Such timbering as may be removed from the tunnel will be considered the property of the contractor and may be again used and paid for in case it is entirely suitable for such use. All spikes, bolts, and other fastenings and all materials and labor incidental to the work of timbering in the tunnel and its removal therefrom will be included in the price paid for such work as stated above.
“ The timber or lumber used for setting up the plant, construction of forms, loading platforms or temporary buildings *91 or structures will not be construed, as a part of the item for timbering tunnel and will be furnished at the expense of the contractor.”
Payment for timbering was to be made on the basis of “ the amount actually used in feet board measure.” The contracting officer did not measure the timber actually used. Instead, a section of the timbered section was measured and then the quantity thus ascertained was multiplied by the number of sections timbered, adding from 5 to 10 percent thereto to cover miscellaneous timber used. Nothing we think more clearly establishes the inaccuracy of this method, obviously not in accord with the specifications, than the fact that the contracting officer first fixed the amount of timber used and to be paid for at 164,000 square feet and thereafter upon a recheckage raised the amount used to 189,000 square feet. The contractor did not measure the timber in place. He did, however, keep an account of all timber purchased and paid for which was used in the timbered section of the tunnel, and he was allowed considerable latitude in the use of timber essential to protect the work in progress. The proof is not only convincing but clearly establishes that the timber used and not paid for was in fact actually used in the timbered sections, and for this timber the contractor was entitled to payment. The amount is $2,500. The facts as found in finding YII warrant the allowance of the amount claimed.
The specifications relating to the placing of concrete provide in part as follows:
“ The quantity of concrete masonry to be paid for shall be the number of cubic yards actually deposited within the lines and grades given in accordance with the drawings, specifications or requirements, deductions being made for all openings.
“ The price paid per cubic yard for concrete under the various items shall include the furnishing and placing of concrete, forms, tie-rods, wires and spacers, the calking and making watertight of all joints in the forms, the trowelling and finishing of all required surfaces, pumping, and all other items necessary to complete the work.”
It was not difficult for the contracting officer to ascertain the number of cubic yards of concrete actually deposited *92 within the lines and grades by the contractor, and while the difference is comparatively small, the contract terms entitle the. contractor to the amount actually deposited. We think the contractor is entitled to a judgment for $231.54 under this item.
Paragraph 40 of the specifications contains provisions under which the contracting officer withheld from the contractor the sum of $1,000 admittedly due him as earned under the contract provisions. Of this amount $500 was paid the contractor after this suit was instituted, leaving a balance of $500 due the contractor. Paragraph 40 reads as follows:
“ 40. Indemnifications of. the United States. — The contractor will hold and save the United States harmless from all suits, actions, damages or costs of every name and description to which the United States may be subjected or put by reason of injury to persons or damage to property resulting from negligence or carelessness on the part of the contractor, his employees or agents in the delivery of materials and supplies, or on account of any act or omission of the contractor, his employees or agents in the execution of the work, and the whole or so much of the moneys due or to become due the contractor under the contract, as may be considered necessary by the contracting officer, may be retained by him until such suits or claims for damages have been settled or otherwise disposed of and satisfactory evidence to that effect furnished to the contracting officer.”
There can be no doubt from the record that the contractor complied with the above specification. No suits or claims of any sort have been preferred against him since the completion of the work more than three years ago, and no valid reason has been assigned for retaining this balance of $500, which is admittedly due. A contention is advanced that the Government’s qualified title to surface rights exacted extreme caution to protect it from liability for injuries apt to be occasioned by the contractor’s operations. This was true during the course of the contract work and for a reasonable time thereafter, but the payments made to the contractor since the work was completed and the small sum now retained clearly indicate that the event, the possible happening of which inspired the specification quoted above, is pre- *93 eluded by the lapse of time. There is no evidence in the record to sustain a finding that the Government is in the slightest danger from the source for which the deposit was retained. The contractor is entitled to a judgment for $500 under this item in suit.
Paragraphs 32 and 34 are as follows:
“ 32. Lines and grades. — All lines and grades will be given by the contracting officer or his representatives, but the contractor shall provide such material and give such assistance as may be required, and shall carefully preserve the marks. The contractor shall keep the contracting officer informed a reasonable time in advance as to times and places in which he intends to do work in order that lines and grades may be furnished and necessary measurements for record and payments may be made with a minimum inconvenience to the contracting officer and the contractor.
“ 34. Supervision. — The work will be carried on under the general direction and supervision of the contracting officer who will employ inspectors for the work. The inspectors will keep a record of the work done and see that all necessary stakes for marking lines and grades are maintained in their proper position. They shall have power to enforce strict compliance with the terms of the specifications, and to reject any work or material that does not conform to the requirements of the specifications. * * * ”
The specifications imposed upon the contracting officer the positive duty of giving and fixing all lines and grades to which the contractor was to work. The contractor’s liability in this respect was to preserve said marks and give advance information to the contracting officer as to where and when he contemplated work so the lines and grades involved might be furnished. The contractor was furnished with lines and grades previous to beginning excavation on the site of the west portal of the tunnel. In order to tunnel into the west portal the contractor was compelled to excavate to a sufficient depth below the surface of the earth. A few days after the contractor had begun excavating at the site of the west portal it was discovered by the defendant’s engineers that a serious error had been made involving the location by the defendant’s engineers of this west portal upon land the Government did not own or possess the right to excavate. This error is admitted and it was subsequently *94 corrected. In the meantime, however, the contractor had excavated 39 cubic yards of earth for which he has not been paid at contract rates. The error complained of was due to mistaken lines and grades. The contractor had no voice in making the location and under the contract possessed the right to be paid in accord with the lines and grades given him. The contractor could not fix the site of the west portal. It was the duty of the contracting officer to fix it, and if he made a mistake in so doing, no provision of the contract warrants a refusal to pay the contractor for observing the lines and grades furnished him. The defendant says this item in suit is a claim for damages, and under specification 39 is not allowable as no claim for the same was filed within five days in accord with that specification. It is not, we think, a claim for damages. The contract provided for payments for excavation and the quantity to be paid for was fixed by the lines and grades furnished by the contracting officer. If errors ascribable to the defendant crept in which increased the quantity, the contract did not impose responsibility upon the contractor for them. The amount allowable at contract rates is $663. This amount will be included in the final judgment.
The next item, relating to the east portal, is allowable upon substantially the same basis as the foregoing item. It totals $270, and will be included in the judgment.
The next item in suit involved an acute disputation as to facts. The controversy must turn upon whether the contractor did excavate to the grades furnished him by the defendant in certain portions of the tunnel. It is established beyond a doubt that within the tunnel area involved, serious mistakes occurred as to the proper grades, resulting in the first instance, and, as the contractor claims, in strict of expensive excavation in addition to what had been done in the first instance, and as the contractor claims, in strict accord with the lines and grades furnished him by the contracting officer. As we have previously noted, it was the express duty of the defendant to furnish the contractor with proper lines and grades in the matter of excavation. This work was being performed 40 feet below the surface of the earth, and the removal of excavation was neither a *95 simple nor inexpensive matter. It was obviously important and vital to supply the contractor with exact and proper lines and grades, for it is inconceivable that a contractor would intentionally depart from furnished lines and grades, when he must have known that a departure therefrom would of necessity involve a costly change in the reproduction of plans and equipment to remedy an error in this respect. In one instance it is sedulously contended that the contractor was grossly guilty by the use of an excessive quantity of explosives deposited in deep holes drilled both inside and outside of the “ B ” lines in blasting work of producing huge quantities of excess excavation, and now it is contended that he did not accomplish sufficient excavation. The motive for doing either one or both of the alleged things is not to be found in the pay provisions of the contract in suit. Excess excavation was not to be paid for, and diminished excavation entailed a great loss, with no contractual rights to recoup it. There exists no record evidence of probative value establishing the fact of the contractor’s departure from lines and grades furnished him by the defendant. It is true the defendant’s inspectors are quite positive in their view of the matter. When, however, the admitted mistakes of the defendant in this regard are taken into consideration, there can be no motive ascribable to the contractor, and the most that can be said is to charge it to his alleged incompetency and gross carelessness. Whatever may have been the shortcomings of the contractor, it is impossible to hold from the record that as to efficiency and diligence in the performance of his work he was greatly outclassed by the defendant’s inspectors. We think that finding X sets forth the facts and that the plaintiff is entitled to recover for this work under the contract $16,494.10.
Article 6 of the contract is as follows:
£AjmoLE 6. If, at any time during the life of this contract, it be found advantageous or necessary to make any change or modification in the project, and this change or modification should involve a material change in the character or quantity of labor or material to be furnished, or in any other provision of the contract, then such change or *96 modification must be agreed upon in writing by the contracting parties, the agreement setting forth fully the reasons for such change, and giving clearly the quantities and prices of both material and labor, or the other provisions thus substituted for those named in the original contract, and before taking effect must be approved by the Secretary of War: Provided, That no payments shall be made in accordance with such supplemental or modified agreement unless the same was signed and approved before the obligation arising from such modification was incurred.”
Paragraph 30 of the specifications reads as follows:
“ 30. Mmor modifications. — The contracting officer reserves the right to make any additions to, omissions from, or alterations in the work as described in these specifications and shown on the drawings referred to in paragraph 29, whenever he shall deem such additions, omissions or alterations necessary or desirable, provided that the sum total of all such additions to or subtractions from the contract plans amounts to less than 10 per centum of the total amount of the contract price.
“All changes will be ordered by the contracting officer in writing, and the value of any additions, omissions or alterations so ordered will be added to or deducted from the contract price. Such value will be determined and fixed by the contracting officer on the basis of the unit price bid under the contract. The contractor shall have no claim for damages or for anticipated profit on account of any additions, omissions or alterations, ordered as above provided, and such additions, omissions and alterations shall in no way vitiate this contract.”
The contracting officer changed the plans for the work in one instance by lowering the limits of the “ B ” line three inches and in another directing the contractor to omit a quantity of lagging from the side walls of the tunnel. The contracting officer in so doing disregarded the express provisions of the foregoing paragraphs of the contract and specifications, and it is conceded that by so doing the contractor was put to the expense now claimed for. Lagging was essential as a means of preventing the side-wall excavations from tumbling down. It was accomplished by the use longitudinally of timber outside the perpendicular timber-ing in the timbered section of the tunnel, and as a result of *97 its ordered omission in the manner claimed the side walls caved in and the contractor was compelled to remove this material at an added expense. The court may not, however, ignore the plain provisions of the contract with reference to changes; they had to be ordered in writing, their cost ascertained, and the sum thereof either added to or deducted from the contract price in accord with the established facts. This was not done. The contractor, however, contented himself with a protest. In our opinion, under the contract he should have refused to comply with orders until he received the same in accord with the contract. The contracting officer possessed no authority to do what he did, and the contractor would have been within his contractual rights in refusing to proceed until the contract provisions were complied with. The intent and purpose of the contract provisions with reference to changes are manifest, and while in this instance an obvious hardship is imposed upon the contractor, we find no way under the law of granting relief. The contract provisions were well known to the parties to the contract and it was the intent of the Government to be protected from claims for changes unless evidenced in the manner provided for in the contract. The specifications were applicable alike to the contractor and the contracting officer. The case of Freund v. United States, 260 U.S. 60, is inapplicable here. The changes involved were clearly changes which under contractual procedure could have been ordered and paid for accordingly; they were alterations clearly contemplated by the contract and not of a character either in scope or extent as to fall without the contemplation of the parties in making the contract. As a matter of fact and law, the provisions of the contract pointed out a specific way in which changes should be made and saved the contractor harmless as to cost and expense in making them.
In the case of Kennedy v. United States, 24 C.Cls. 122, where there was a provision in the contract requiring the approval of the Chief of Engineers of extra work, the court said, page 144:
“ This provision is one of the essential terms of the agreements, and its recognition and enforcement are absolutely *98 necessary in order to protect the right of the Chief of Engineers, by whose approval the instruments were given the force of contracts.”
See also Hyde v. United States, 38 C.Cls. 649.
In Plumley v. United States, 226 U.S. 545, 547, the court said:
“ There was a total failure to comply with these provisions, and though it may be a hard case, since the court found that the work was in fact extra and of considerable value, yet Plumley cannot recover for that which, though extra, was not ordered by the officer and in the manner required by the contract,”
citing Hawkins, 96 U.S. 689; Ripley, 223 U.S. 695; McMullen, 222 U.S. 460.
In Kilmer v. United States, 48 C.Cls. 180, 193, the court said: “ If in such case the officer of the Government directing the work refuses to enter into a written agreement or to order the work in writing as the contract may require, on the ground that the work is embraced within the contract, then the contractor’s remedy is by appeal to a higher officer, if the contract so provides, in which case, under the ruling in the cases cited, if the decision is against the contractor he would, in the absence of fraud or gross error, be remediless.” See also Sanford & Brooks Co., 58 C.Cls. 158, affirmed 261 U.S. 455; Daly & Hannan Dredging Co., 55 C.Cls. 1.
Morgan v. United States, 59 C.Cls. 650, 654:
“ This requirement is to be treated as a change in the specifications required by the contract to be directed by the contracting officer in writing. Plaintiff’s proper course was to insist that he be so directed before performing.”
In Brant v. United States, 46 C.Cls. 409, 415, the contract required that changes be in writing approved by the Secretary of War, and the court said:
“ In this case to depart from legal precedent would be equivalent to holding that an officer in charge of Government work under a written contract as prescribed by statute might change and vary its terms and conditions at his pleasure.”
*99 In Ferris v. United States, 28 C.Cls. 332, 342, the court, in construing a provision requiring changes to be ordered by the Chief of Engineers, said:
“ The provision of the agreement under consideration is very important in its character and office. It keeps within the power of the department, or the office making the agreement, the control of the contract and prevents persons in charge of the mere execution of the work from changing the rights and increasing the liability of the Government.”
See also Ford v. United States, 17 C.Cls. 60, 75.
A similar case is Dale v. United States, 14 C.Cls. 514, where the court used this language:
“ Where a contract provides that no claim shall be made by the contractor for extra work unless ordered with the approval of the defendant’s Chief of Engineers, the contractor cannot recover for extra work or material furnished by direction of the local agent without the knowledge or approval of the Chief of Engineers.”
See also Reilly Repair & Supply Co. v. Smith, 177 Fed. 168.
Finding XII discloses the facts with reference to plaintiff’s claim for unwarranted interferences with his plans and adopted order of performing the contract work. The contract undoubtedly vested the right to interfere with the contractor’s method of construction if in the deliberate opinion of the contracting officer the work was not being done properly, and the burden is upon the plaintiff to establish unwarranted interference before recovery is allowable. As to this item in suit we think the plaintiff has successfully proven that the interference with his plan was not only unwarranted but substantially arbitrary. In the first place, the voids and cavities behind the side-wall plates were not numerous, and, as experience actually established, were capable of being filled after the arch of the tunnel had been constructed. They were not an existing menace to the accomplishment of the engineering plans of the contractor, which in any way endangered the final solidity of the arch of the tunnel. This fact is clearly established for they were not filled except in accord with the contractor’s promise to see to it that grout instead of cement filled them. Again, *100 the fact that the contractor was in the end allowed to do as he originally planned, by way of constructing the tunnel arch, indicates, in our opinion, that the inspectors and contracting officer unwarrantedly delayed him in completing his work. The situation confronting the parties was not one of difficult solution; it could have easily been settled long before it was, and the contracting officer possessed ‘the authority under the contract to exact of the contractor the replacement and correction of any deficient work wherever it was discovered to exist. The arch was constructed as the contractor planned; the work was approved, and in our view of the case the interference of the contracting officer undoubtedly increased the financial burdens of the contractor. We believe that the distinction between error and unwarranted interference upon the part of the contracting officer obtains herein. The changing personnel of the inspection force was largely, if not wholly, responsible for forbidding the contractor to proceed in accord with settled and approved plans, which the record establishes to be in accord with good engineering. Collins v. United States, 34 C.Cls. 294. Houston Construction Co. v. United States, 38 C.Cls. 724; United States v. Barlow, 184 U.S. 123.
The plaintiff’s demand for damages is, in our opinion, grossly excessive. The effect of the interference was not to forestall all construction work, nor are we able to find that the tunnel would have been completed four months earlier than it was if this interference had not obtained. That it delayed dry packing and grouting over the crown of the tunnel arch, and retarded to a considerable extent the progress of the work, is established, but the proof establishes that from a monetary point of view the delay involved but a single shift of workmen and the maintenance of a proportionate part of overhead, i. e., certain steady-time men, expense of pumping, electricity, idle machinery, and cost of supervision continued during this period of delay, when as a matter of fact these factors of expense could have been profitably utilized if the contractor had been permitted to use them as he planned. Taken upon the basis of proof in the record, we think $11,225 is the total amount of damages proven, and for this sum a judgment will be awarded.
*101 The time limit for completion of the contract expired on December 24,1926; the contractor did not complete the work until July 14, 1927. There was withheld from sums due the contractor $4,219.32 extra cost to the Government for failure of the contractor to complete within the time limit. Liquidated damages are not involved and the time limit was waived by the defendant. Article 5 of the contract, heretofore set forth, governs the decision of this issue. The record sustains the fact that in some instances the contractor was delayed by the contracting officer, and for the loss sustained by said delays we have awarded judgment. On the other' hand, there is nothing in the record to warrant a positive finding that except for these delays, the contractor would have completed the work on time. On the contrary, it is extremely doubtful if he could have completed the work within the time specified. In addition to this, however, and as a matter of law, the decision of the Chief of Engineers as to the matter was made final, and, it is conceded by the plaintiff in the brief, may not be set aside except for bad faith or such gross error as would warrant the court in implying bad faith. While no express ruling of the Chief of Engineers is found in the record, we think, as suggested by plaintiff’s counsel, that the retention of the sum claimed is sufficient evidence of his approval. If not, however, as we have previously said when heretofore discussing interferences, there is no basis in the record for finding that the plaintiff could have completed the work on time. This was a unit price contract and interferences which added to plaintiff’s expense of performance diminished his profits; whereas delays in the performance of the work beyond the contract period likewise added to the Government’s costs of inspection, etc., as set out in article 5 of the contract. It is, of course, difficult in cases of this character to give effect to conjectural opinions as to the extent Government interferences prevented the contractor from completing on time; the balancing of testimony upon this issue involves a careful analysis of the record, and in this case with a large and extremely contradictory record it is impossible to find that the contractor progressed with his work so as to complete the same on time, even without the Government’s delays. He did *102 not complete performance for seven months after the contract period, and certainly much was to be done to complete it after December 24, 1926.
We might leave the disposition of the final claim in suit to finding XIV. In order to establish misrepresentation it is incumbent upon the plaintiff to prove that what was represented was not in fact the true situation. Misrepresentation as the result of borings taken to disclose the character of materials through which the drill passes in making the same cannot be predicated alone upon the discovery of different materials in the process of excavating. It must be proven to the satisfaction of the court that the borings made and shown on the drawings are not only inaccurate as to location but false as to materials found. Hollerbach v. United States, 233 U.S. 165; Christie v. United States, 237 U.S. 234. The plaintiff is required to establish by proof a radical departure from actual facts, i.e., that the borings actually encountered soft earth and the officials represented it as rock formation. If the borings made encountered a type of formation, and the type encountered is shown upon the chart or drawing there can be no misrepresentation, even though when excavation takes place in an enlarged area different materials are encountered, there must exist some misstated fact which deceives the contractor into believing that the borings disclose a situation which did not in fact exist and which the borings taken did falsely disclose. The specification quoted in finding XIV warned the contractor, and by the terms of the same precludes a recovery for this item in suit. If the drawing correctly shows what the bor-ings themselves disclose without material alteration or misstatement of the character of materials actually taken by the borings, then no misrepresentation exists; as a matter of fact, misrepresentation in this respect must possess some either sinister or careless purpose calculated to mislead a contractor, in that they put forth a statement as to an existing condition, when, as a matter of fact, no such condition was shown by the borings. Such is not the case here.
Judgment for $45,174.46. It is so ordered.
Whaley, Judge; Williams, Judge; Littletokt, Judge; and GbeeN, Judge, concur.