SANDKAY CONSTRUCTION CO., a Corporation (as successor in interest to Cherf Bros., Inc., and Sandkay Contactors, Inc., a Joint Venture), Plaintiff and Respondent, *v.* The STATE OF MONTANA, a sovereign State of the United States of America, Defendant and Appellant.

No. 10832

Submitted February 10, 1965. Decided March 15, 1965.

399 P.2d 1002.

Clayton R. Herron (argued), Helena, Forrest H. Anderson, Helena, for appellant.

Michael J. Hughes, Helena, George T. Bennett (argued), Helena, Clifford O. Moe, Ephrata, Wash., Gerald DeGarmo, Seattle, Wash., for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment in favor of the plaintiff, hereinafter called Sandkay. Findings of fact and conclusions of law were made and judgment entered. A motion for new trial was denied.

Sandkay is a road contractor and was low bidder on a State Highway Commission road job to grade, aggregate surface, bituminous surface, and drain 2.613 miles of road according to plans, standard specifications, supplemental specifications and special provisions for the sum of $450,982.35.

Preliminary to bidding on the contract the State issued to prospective bidders, Plans and Profile, Cross-Sections, and a Mass Diagram all of which are referred to as the plans and specifications.

The plans and specifications show in detail the quantities of embankment (without a shrinkage factor), excavation, unclassified and borrow, together with the mile yards overhaul required, by survey station.

As to the excavation and overhaul to be performed the plans summarized the quantities as follows:

| | |
|---|---|
| Excavation, unclassified | 327,855 cubic yards |
| Borrow | 215,614 cubic yards |

Total excavation, unclassified
and borrow                                  543,469 cubic yards
Embankment                                  543,469 cubic yards
Mile yards overhaul                         107,377 mile cubic yards

Specifically with reference to the stations in question the plans provided that Sandkay was, in constructing the road, to make a "cut" through a hillside by removing 45,795 cubic yards (in place) of material and was to fill the intervening low area with such material and to obtain an additional 215,-614 cubic yards of material from a "borrow pit" located on the plans some 1,800 feet north of the roadway. Under the plans, 107,337 mile yards of overhaul to transport the borrow material to the fill or embankment was anticipated.

Before submitting a bid, Sandkay made several inspections of the construction site and inspected the area where roadway cuts were to be made and the area designated by the State for the borrow pit, and based upon such inspection and consultations with State officials, determined the type of material to be excavated from each such area. It was determined that the type of material to be excavated in the roadway cut was solid and semi-solid rock and the material to be excavated from the borrow area was loose material or "common borrow".

Based upon the detailed plans and specifications and the personal inspections, it was anticipated that 45,000 cubic yards of rock excavation would be required in the roadway cut, and approximately 215,000 cubic yards of common borrow excavation in the borrow area were needed, and upon this the bid estimates were prepared.

The bid was to be a composite bid for all excavation for 582,442 cubic yards of unclassified excavation, to consist of excavation, unclassified and borrow, Sandkay computed the estimated cost of the rock excavation and then separately computed the estimated cost of the borrow excavation and arrived at a bid of 54 cents per cubic yard. Because the rock excavation required extensive "drilling and shooting" before

it could be moved with conventional equipment, the bid estimate was $1.05 per yard excavation, 69 cents per yard of cubic roadway, as against 31.1 cents per yard of borrow excavation. Thus, Sandkay estimated the cost of excavating the roadway at more than twice that of excavating the borrow material and based the composite bid for all excavation upon the computed estimates for each separate operation divided by the quantity, *all as shown in the plans and specifications as furnished by the State.*

Sandkay started the excavation of a particular cut and found that the roadway cut would not stand up at the slope-angle set forth in the plans furnished by the State. The condition is best described by a witness as follows:

"We commenced construction on this roadway cut, * * * and almost immediately after we commenced construction of the cut, it ruptured and slides and cracks appeared behind the State cut, indicating that the material excavated to the face as stated by the Highway Department is not stable.

"Q. In other words, were you excavating, then, on a line as staked by the Highway Department? A. Yes, sir.

"Q. What was that original stake? A. The original stake was on a three-quarter-to-one back slope.

"Q. And in conformity with the plans and specifications and profile, and cross section, and Mass Diagram that you bid the job on? A. Yes, sir."

Because the original engineering design of the Highway Department by reason of unknown conditions proved unworkable, as shown by the above testimony, and resulted in unstable slopes in this major cut, the project engineer redesigned to give a progressively flatter slope, and Sandkay was required to excavate more and more of the solid and semi-solid rock, so that, although the plans and specifications showed a cut volume of rock of approximately 45,795 yards, Sandkay actually was required, under protest and by order of the project engineer, to remove 178,453 cut yards of rock. The result

was to increase the more expensive rock excavation and to eliminate most of the less expensive borrow excavation.

The result in terms of dollars was that the State paid Sandkay $64,910.13 less by changing the source of material than would have been paid under the plans, if the same had not been in error, and Sandkay incurred additional logged direct costs over what would have been incurred had the excavation been as set forth in the plans and specifications in the sum of $32,235.89.

The contractor, Sandkay, claimed an additional $32,235.89 for extra compensation due to the changed conditions in the performance of the contract for the construction.

The State claims that, under the terms and provisions of the contract involved, there were no changed conditions in that the contractor was required, in the performance of the contract, to do only what he had contracted to do. This the State insists comes about by the "'composite" bid. Or, put another way, the State argues that the contractor was not required to move any additional yardage, the only change being that he was required to move more roadway (cut) yardage and less borrow excavation.

The specifications of error go to the findings, and bring up the question we will state as follows:

Does a contractor assume the risk of defects in plans and specifications when the bid call is for unclassified materials under a composite bid? Or to state it with more particularity, where plans and estimates or specifications are used as a basis for bids, is a contractor who has been led to believe that the conditions indicated in such plans exist, able to rely on them and recover for expenses necessary by conditions being other than as represented by such plans?

The district court had found in part as follows:

"As a direct and proximate result of being required to excavate rock and solid and semi-solid material from the unstable hillside * * * and [Sandkay] were forced to and did

perform *an entirely different contract* than the one upon which they bid * * *."

First we shall observe that from the testimony and exhibits, it can be said that the slide condition encountered was a major one and could not have been reasonably anticipated. It was not anticipated by either the contractor or the State engineers. Even more, as subsequent events demonstrated, the first effort to re-stake the cut from a $\frac{3}{4}$:1 slope to a $1\frac{1}{2}$:1 slope was not sufficient; that had to be increased to a 2:1 slope. Even that, subsequently we are informed during oral argument, did not suffice to check the sliding. Any fair reading of the record supports the trial court's finding that the resulting excavation was "an entirely different contract than the one upon which they bid."

The State, though, argues that provisions of the "Standard Specifications" are incorporated by reference into the construction contract. The "Standard Specifications" consist of a printed book containing 502 pages. One provision, Section 11.02 appearing on pages 78 and 79 states in part:

*"No material from borrow pits shall be used until it is determined that all 'roadway and drainage excavation' can be utilized in the embankments.* Borrow areas will be designated either on the plans or by the engineer. Material taken as borrow prior to being staked by the engineer will not be paid for.

*"When so directed, cuts shall be uniformly widened and slopes flattened, where necessary, to obtain additional excavation for embankments and/or to increase stability of slopes.* When rock is encountered, where slopes will stand at a steeper slope than shown in the plans, the slopes shall be steepened as ordered by the engineer.

"Where the ground foundation for embankments is composed of muck and/or other unstable materials such materials shall be removed to the depth shown on the plans and/or as directed by the engineer and satisfactorily disposed of. The excavated areas shall be backfilled with suitable material as directed." (Emphasis supplied.)

Further, section 11.03 of the Standard Specifications states in pertinent part as follows:

"METHOD OF MEASUREMENT. (1) Roadway, drainage and borrow excavation, unless otherwise specified, shall be classified as 'Unclassified Excavation'. All accepted roadway, drainage and borrow excavation shall be measured by the cubic yard in its original position by the method of average end areas. Measurement will include all slides not due to the carelessness of the contractor and authorized excavation of rock and soft spongy spots below grade or below original ground line of embankment areas."

Further, section 09.03 of the Standard Specifications states as follows:

"PAYMENT AND COMPENSATION FOR ALTERED QUANTITIES. When alterations in plans or quantities of work not requiring supplemental agreements as hereinbefore provided, are ordered and performed, the contractor shall accept payment in full at the contract unit prices for the actual quantities of work done. In no case of altered quantities will any allowance be made for any increased expenses, loss of expected reimbursement, or loss of anticipated profits suffered or claimed by the contractor resulting either directly from such alterations, or indirectly from unbalanced allocation among the contract items of overhead expense on the part of the bidder and subsequent loss of expected reimbursement therefor, or from any other cause."

These provisions, the State insists, make the contract so that regardless of what was written on the plans and profiles as to the contemplated quantities of roadway excavation and borrow excavation, the standard specifications and contract provided for no classification of excavation; no additional compensation for changes; that all roadway excavation would be used before borrow excavation; and that cuts would possibly be required to be widened and slopes flattened in order to increase stability of slopes.

On the other hand Sandkay, respondent here, insists that the "Standard Specifications" allow some degree of flexibility and are or may be modified as detailed in the plans and specifications. And, further, where the plans and specifications are found to be defective in major elements, the contractor is entitled to compensation.

The trial court as a conclusion of law held:

"That the provisions of the Standard Specifications for Road and Bridge Construction, as set forth in Finding of Fact XIV above, and as a part of said Contract, were intended by both parties and can only be construed to allow the Project Engineer to make those normal and anticipated changes in the Plans and Drawings required by the exigencies of ordinary and anticipated highway construction and were not intended by the parties and cannot be construed to apply to conditions which are abnormal, unanticipated and substantially different from those shown in the Contract Plans and Drawings, or to authorize or allow Defendant to require the different and more difficult excavation without additional compensation." We find the conclusion of the trial court to be correct.

The contract itself provided that the plans and specifications were to control over the standard specifications. Subsections 05.03 and 05.04 of the Standard Specifications in and of themselves state that all of the work must be done in strict accordance with the plans and specifications and that the plans, profiles and cross-sections will show the location, details and dimensions of the work contemplated, and that in case of any discrepancies the plans and specifications are to prevail over all other provisions of the contract, and reads as follows, to-wit:

"05.03 CONFORMITY WITH PLANS AND ALLOWABLE DEVIATIONS. The approved plans, profiles and cross sections will show the location, details and dimensions of the work contemplated. The designated work shall be performed in strict accordance therewith and in accordance with the specifica-

tions. Any deviation from the plans that may be required by the exigencies of construction will, in all cases, be determined by the engineer and authorized in writing.

"05.04 COORDINATION OF SPECIFICATIONS, PLANS AND SPECIAL PROVISIONS. All requirements of the plans, specifications and special provisions shall be binding upon the contractor. On all plans and drawings the figured dimensions shall govern in case of discrepancy between figured dimensions and scaled dimensions. Modifications of these standard specifications may be indicated in the Plans, Supplemental Specifications or the Special Provisions for a particular contract. (See Articles 01.52 and 01.64). In every case of such modification, or of discrepancies between the Standard Specifications and the Plans and Special Provisions, the Plans shall govern over the Standard Specifications, the Supplemental . Specifications over the Standard Specifications, and the Special Provisions shall prevail over all."

R.C.M.1947, § 13-714, provides:

"13-714. *Contract restricted to its evident object.* However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract."

Clearly, under the situation here, the parties did not intend to contract for such an unexpected happening. To reiterate, the percentages of change resulting demonstrate the trial court's correctness in finding an entirely different contract was performed than was contemplated. The more expensive rock excavation increased, and most of the less expensive borrow excavation was eliminated. In addition to these changes, the testimony demonstrated too, as the court found, that even different types of equipment and methods were necessary than either party contemplated.

This court in Leigland v. McGaffick, 135 Mont. 188, 338 P.2d 1037, approved a rule of law that a contractor is not responsible for errors or defects in the plans, and is not liable,

absent negligence on his part, where the owner's plans and specifications prove defective. For a collection of cases see 76 A.L.R. 268.

We believe the language used in Peter Kiewit Sons' Co. v. United States, 74 F.Supp. 165, 167, 168, 109 Ct.Cl.517, to be apt. There it was said:

"Both the Government and the plaintiffs, when they entered into the contract, believed that the ratio of 1,600,000 cubic yards of channel excavation to 2,300,000 cubic yards of borrow excavation could be relied on for the purpose of basing thereon a composite price per yard for the total yardage of the estimated 3,900,000 cubic yards of the two types of excavation. * * *

"* * * If they did so, the contract was not intended by the Government to be speculative, as the War Department Board of Contract Appeals said, but was perfectly capable of being computed and bid conservatively. It was obvious that, a composite bid being required, a great variation in the proportion of the different types of excavation would be ruinous to the contractor, or would cause the Government to pay far more than the work was worth. We have no reason to suppose that the Government intends to make its contracts on such an irrational basis."

The State attempts to distinguish the Kiewitt case because it argues that the United States government contracts have a "changed conditions" clause whereas the contract in question here does not. We need not dwell on this here, because as we have pointed out before, the parties simply did not intend to contract for any major change from the plans and specifications as occurred here.

But one other matter need be discussed. The State urges that the amount of the award is incorrect. The State contends that the amount is figured on a unit cost of 47 cents per yard, and that Sandkay's own evidence was that a subcontractor did the actual removal at 40 cents per yard, and, further that a

subsequent contractor bid at 35 cents per yard for a still later job on the same slide area.

The record reveals the conditions encountered were so much different than what either Sandkay or the State Engineers expected, that Sandkay had to even bring in different equipment. Sandkay immediately notified the State of its demand for additional compensation. It kept isolated and detailed costs. The subcontractor Winslow did move the material that slid onto the highway at 40 cents, but did not have to "drill and shoot" and excavate the rock. Neither, for all that appears in the record did the subsequent contractor. We find no merit to this contention.

Finding no error, the judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES DOYLE, JOHN CONWAY HARRISON and ADAIR concur.