A. G. HASH, d/b/a HASH CONSTRUCTION CO., Plaintiff
and Respondent, v. R. J. SUNDLING & SON, INC., De-
fendant and Appellant.

No. 11294.
Submitted October 17, 1967. Decided December 28, 1967.
436 P.2d 83.

Berg, O'Connell & Angel, Bozeman, Ben E. Berg, Jr. (argued), Bozeman, for appellant.

Berger, Anderson & Sinclair, Billings, Richard W. Anderson (argued), Billings, for respondent.

MR. JUSTICE HASWELL delivered the Opinion of the Court.

This is an appeal from a judgment awarding a highway construction subcontractor the sum of $14,272 and interest against the prime contractor covering the reasonable cost of performing certain alleged unanticipated excavation under the subcontract between them. The case was tried in the district court of Park County before the Honorable Nat Allen, presiding judge, sitting without a jury, who rendered judgment based on his findings of fact and conclusions of law.

The plaintiff in the case is A. G. Hash, d/b/a Hash Construction Co., who is the subcontractor on the excavation work involved in the highway construction project herein, and who will be referred to hereafter as Hash. Defendant in the case is R. J. Sundling and Son, Inc., who is the prime contractor with the State of Montana on the entire highway construction contract and who subcontracted the excavation work to Hash; defendant will hereafter be referred to as Sundling. The contract provisions relating to the excavation work were contained in the prime contract between the State of Montana and Sundling; these identical provisions were incorporated in the subcontract between Sundling and Hash.

On June 25, 1963, Sundling entered into the prime contract with the State of Montana to reconstruct and widen approximately 5½ miles of highway in Gallatin County between Gallatin Gateway and Four Corners. The construction project generally involved removing the oiled surface of the existing high-

way, excavating down to a subgrade indicated by the plans and specifications for the project and staked by the Montana Highway Department, widening the highway and establishing a corresponding subgrade on the widened portion, and constructing the widened highway accordingly.

The specifications for the project as set forth both in the prime contract and the subcontract consisted of standard specifications common to all highway construction projects which were set forth in a pamphlet of 460 pages divided into 97 different sections. Insofar as these standard specification are pertinent to the excavation work in the instant case, they provided: (1) That the excavation work generally would consist of excavating and grading the roadway and borrow pit including excavation, removal, and disposal of unsuitable material from the roadbed and embankment areas within the limits of the work according to the specifications shown in the plans or as staked by the engineer; (2) Where the ground foundation for embankments is composed of muck or other unstable materials the same would be removed to the depth shown on the plans or as directed by the engineer, and the excavated area backfilled; (3) That the bidder would make a thorough examination of the site, the proposal, the plans and specifications, and the contract before bidding and satisfy himself as to the conditions to be encountered; (4) That some changes in the plans and specifications are inherent in highway construction contracts which must be recognized at the time of bidding within normal and expected margins, and the engineer has the right to make such changes; (5) That if such changes exceed an increase or decrease of more than twenty-five percent in (a) the length of the project, (b) the total cost of the work calculated from the original proposal of quantities and contract unit prices or (c) the quantity of any major contract item (including earth or common roadway excavation but excluding any other class or item of foundation piling), a supplemental agreement would be made covering adjustments in payment;

(6) Such adjustments would be made on the basis of the contract unit prices in the original contract for the additional work and materials; and (7) In case of discrepancies between the standard specifications and the plans, the plans would govern.

The plans for the project in general called for stripping off the oil mat on the existing highway, excavating to an average depth of one to two feet below the level of the existing road as staked by the Highway Department, and widening the road. The excavation generally did not exceed the base of the existing roadbed, did not reach the borrow pit level, and was already staked out by the Highway Department.

Hash became interested in securing a subcontract with Sundling for the excavation work involved. Hash inspected the site, examined the plans and specifications for the project, cross-checked the plans and specifications against the grade stakes installed by the Montana Highway Department, noted some wetness in the ditch bottom in the borrow pit alongside the existing highway and at one point probed the ditch bottom with a stick and found mud to a depth of one foot, and found that the general excavation depth averaged one to two feet beneath the surface of the existing road and generally did not exceed the base of the existing roadbed. Hash also talked to Sundling and to the project engineer for the State Highway Department, but the evidence is in conflict as to the statements allegedly made by them to Hash concerning the wetness of the subgrade and the conditions he was likely to encounter.

Subsequently Hash and Sundling negotiated the price of 25 cents per cubic yard for the excavation work under the subcontract at which time Hash indicated that soft conditions might be encountered in the excavation. On September 3, 1963, Hash entered into a subcontract with Sundling for the excavation work on the project consisting generally of unclassified excavation of 155,584 cubic yards at 25 cents per cubic yard or a total price of $38,896 according to the plans, specifications,

bid and proposal on file with the Secretary of the Montana Highway Commission pertaining to the project.

Shortly thereafter Hash commenced the excavation work on the project and all went well for two or three weeks. At that time Hash began to encounter excessive wetness below the sub-grade which required extensive "dig-outs" below the subgrade to provide a solid foundation for the bed of the highway to be constructed. The State Highway project engineer required of Sundling that all muck, water and unstable material be re-moved and that the excavation so created be backfilled; Sund-ling in turn required Hash to do this. All evidence indicates that Hash discussed with Sundling the matter of additional compensations for this work, but a substantial conflict exists over what assurances, if any, Sundling made to Hash covering additional compensation. Hash claims that shortly after he en-countered the excessive wetness below subgrade as indicated in the plans and was required to make an extensive "dig-out," he told Sundling he would have to quit and forfeit the work already done because he simply could not dig out the type of material actually encountered for the contract price, but that Sundling told him to go ahead with the excavation work, keep track of his time and expense on the excavation work below subgrade, that although he (Sundling) did not want to get into trouble with the State until after completion of another job for them, at that time he (Sundling) would see that Hash got additional compensation even to the extent of suing the State, if necessary. Hash claims that he continued the excava-tion work on the project based upon these representations by Sundling.

Sundling, on the other hand, claims that he told Hash he would try to get him additional compensation from the state for the subgrade excavation work and any additional compen-sation so received would go to Hash. Sundling claims that his representations did not go beyond this point.

It should be noted that rather extensive "dig-outs" below the

subgrade established by the plans and specifications of the State Highway Department for the project were required involving rather extensive use of additional men and equipment, considerably more time and expense, and the use of unusual techniques to accomplish the work. The excessive wetness encountered in the excavation was all below the subgrade as established by the plans, specifications, subgrade profiles and grade stakes of the State Highway Department; this excessive wetness covered approximately two-thirds of the entire project. The reasonable cost of the "dig-outs" required because of this excessive wetness below subgrade was established as being approximately 92 cents per cubic yard, as against the bid of Sundling of 30 cents per cubic yard and the bid of Hash of 25 cents per cubic yard.

It is to be observed at this point that the excavation work required by the contract called for approximately 155,000 cubic yards of unclassified excavation which was later reduced to approximately 135,000 cubic yards because of a grade change made after the original contract and subcontract were entered into. The excavation work actually performed under the prime contract and the subcontract consisted of approximately 149,-000 cubic yards. It should be noted, however, that the claim involved in this case is not based upon any additional cubic yardage of excavation work required to be done, but instead is based upon a substantial increase in the total cost of the excavation work performed because of the increased ratio of high-priced excavation to low-price excavation. The claim involved here is for 21,410 cubic yards of excavation below the subgrade established by the plans and specifications for the project where excessive wetness was encountered resulting in a substantial increase in excavation costs.

Sundling attempted to secure additional compensation because of the excessive wetness encountered below the subgrade, but the State Highway Department refused to pay additional compensation. Eventually this refusal was communi-

cated to Hash and after Sundling refused additional compensation to Hash and declined to sue the State, Hash sued Sundling for the reasonable value of the high priced excavation work performed due to excessive wetness encountered outside the scope of the plans, specifications and subcontract. The judgment awarded in the instant case represents the difference between the subcontract price of 25 cents per cubic yard for the excavation and 92 cents per cubic yard which was established as the reasonable value of the additional excavation required due to conditions actually encountered.

The issues presented for review upon this appeal can be summarized as follows:

(1)  Whether Hash should have anticipated the wetness and soft subsurface conditions actually encountered on the project in making his bid and entering into his contract and consequently should be denied additional compensation;

(2)  Whether Sundling made a supplementary oral agreement with Hash to pay him additional compensation.

The problem in the instant case is not so much with the law as with the facts. The standard specifications in the subcontract as hereinbefore set forth provide for additional compensation. Additionally, it is clear that under appropriate circumstances, the contractor who encounters substantially different conditions in performing a construction contract from those contemplated and set forth in the plans and specifications contained herein may be entitled to increased compensation for the additional work. See generally 76 A.L.R. 268; 85 A.L.R.2d 212. The test of whether or not such contractor is entitled to additional compensation is whether or not he justifiably relied upon the plans and specifications for the construction in making his bid and entering into the contract. Sandkay Const. Co. v. The State Highway Commission, 145 Mont. 180, 399 P.2d 1002; Haggart Const. Co. v. State of Montana, 149 Mont. 422, 427 P.2d 686. The reason for this rule is that if unanticipated conditions not reasonably foreseeable are

actually encountered in the work and vary substantially from anticipated conditions reasonably foreseeable by the parties at the time they entered into the contract, the contractor is performing an entirely different contract than the one agreed upon and in such case is entitled to the reasonable value of his additional services.

Applying these principles to the facts and circumstances of the instant case, it is clear that at the time Hash entered into the excavation subcontract he relied upon the plans and specifications, the grade stakes and his own observation at the site and concluded that although some wetness would be encountered in the borrow pit alongside the highway he did not anticipate this condition underneath the road surface at the depth of the required excavation as established by the plans and specifications, and submitted his bid accordingly. It was only when he was required to go to a depth below the subgrade as established by the State Highway Department in their plans and specifications and so staked out by them that he encountered the excessive wetness that required the additional work for which he is suing herein. Neither the State Highway Department, the prime contractor Sundling nor Hash anticipated this excessive wetness; it was only because Hash was required to go outside the scope of his contract that these conditions were encountered. Certainly Hash was entitled to rely upon the plans and specifications for the job, the profiles of the subgrade, and the grade stakes in determining the depth of the required excavation in submitting his bid and entering into the excavation subcontract, unless there was something therein that would indicate that he should have reasonably foreseen and anticipated the conditions actually encountered. This is the crux of the matter in the instant case and is clearly a factual inquiry.

Sundling contends that Hash should have reasonably foreseen and anticipated the conditions actually encountered because (1) the road in question crossed subirrigated pasture

lands for a considerable distance and at one point called for construction of a drainage ditch which crossed under the roadway; (2) at one point a spring drained from the pasture into the borrow pit alongside the road and readily observable; (3) at one point a farmer's canal was in close proximity with the new right-of-way and was located above the highway to be constructed and that this canal had a gravel base which would indicate some drainage and seepage into the borrow pit alongside the road and the subgrade; (4) mud was encountered in a ditch on the east side of the highway at one point which should indicate a wet subgrade; and (5) the patching on the oiled surface of the existing highway indicated an unstable subgrade.

Hash's contention in answer to Sundling's are these:

(1) That he knew the bottom of the borrow pit and ditch alongside the highway were wet in some places, but he did not anticipate this would affect his excavation work because the excavator's work was all above the level of the borrow pit according to the plans and specifications for the project and as staked by the State Highway Department;

(2) That wetness in the borrow pit alongside the road whether caused by seepage, drainage, springs or other sources is no indication that wetness would be encountered in excavating to the subgrade below the surface of the highway established by the plans, specifications and grade stakes and

(3) Site inspections indicated adequate drainage throughout the project, that the general condition of the roadbed of the old highway was good, that it was not sagging or falling in any place, and that the foundation appeared solid.

It appears reasonably clear to us that the foreseeability of conditions actually encountered is purely and simply a question of fact and the trial court having determined such fact adversely to Sundling based upon conflicting evidence has thus foreclosed Sundling's contentions herein. As a consequence and because the trial court has determined that the con-

ditions actually encountered were not reasonably foreseeable and could not have been anticipated by Hash, Hash was justifiably entitled to rely upon the plans and specifications for the project, the profiles of the subgrade and the grade stakes in bidding on the subcontract for excavation. Thus when Hash was called upon to perform an unexpected type of excavation outside the scope of the contract, he became entitled to the reasonable value of his additional work.

As to the second issue presented for review as set forth above, we will comment on it briefly. The trial court made this finding of fact relating to the second issue presented for review:

"In addition to performing an entirely new and different contract, as set forth in the findings of fact stated above, plaintiff and defendant entered into an oral agreement for the below subgrade excavation, wherein plaintiff relied upon defendant's promise to obtain from the State and to pay additional compensation for such excavation. Defendant made at least one early request to the State for such additional compensation, but was promptly refused. Defendant then concealed this knowledge from plaintiff until the project was completed, and permitted plaintiff to continue with such excavation in the mistaken belief that the State would pay more money. Plaintiff first learned of the State's refusal when the project was approximately 80 percent completed, and the information at this time did not come from the defendant, but from the State Engineer."

We recognize that the evidence is sharply in conflict on this issue. Depending upon which witnesses and which testimony is given credence, the finding could be either way on this second issue. The trial judge who observed the characteristics of the witnesses while testifying as well as hearing the substance of their testimony was in a better position than this court to judge their credibility and the weight to be given their testimony. Suffice it to say, there is substantial, credible evi-

dence in the record to sustain the findings of the trial judge. Under such circumstances, his findings on this second issue will be affirmed.

The judgment of the district court is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES ADAIR, CASTLES and JOHN CONWAY HARRISON concur.