KIELY CONSTRUCTION COMPANY, a Corporation, Plaintiff and Respondent, v. State of Montana, Acting by and through the STATE HIGHWAY COMMISSION of the State of Montana, Defendant and Appellant.

No. 11637.
Submitted December 11, 1969.
Decided January 20, 1970.
463 P.2d 888.

John A. Alexander (argued), George P. Sarsfield (argued), Butte, for appellant.

Corette, Smith & Dean, Kendrick Smith (argued), Butte, for respondent.

MR. JUSTICE JOHN C. HARRISON, delivered the Opinion of the Court.

Plaintiff brought this suit for two different claims arising out of the performance of a highway construction project. The trial court directed the verdict for the plaintiff as to liability on one of the claims and the jury awarded the verdict for the plaintiff on the other claim. Damages were awarded in the amount of $25,000 for each claim. Defendant appeals from judgment and a denial of a motion for a new trial.

Kiely Construction Company (hereinafter referred to as Kiely) was the successful bidder on the "Butte East Project" on Interstate 90. Kiely was to subsurface and pave with concrete approximately 2.8 miles of the road east out of Butte over Pipestone Pass toward Bozeman. When the project was completed Kiely had expenses greatly in excess of estimates on two particular parts of the job, first the crushing operations in a rock quarry, and the second, the added expense of obtaining concrete aggregate sand for paving the road. Believing that the additional expense was attributable to actions and errors on the part of the highway department rather than just a failure to properly bid the project, Kiely filed a claim for additional compensation. The highway department refused to pay and Kiely sued.

The Montana State Highway Department as a matter of regular practice provides prospective bidders on road construction projects with an "Available Surfacing Materials Re-

port," a report that describes the condition and site of rock quarries and gravel pits obtained for use on the project. The purpose of providing this report is to assist the contractor in preparing his bid and to obtain a lower bid.

Approximately twelve days before bids on the "Butte East Project" were to be let Kiely received an Available Surfacing Materials Report from the State Highway Department. The first page consists of a graph showing the percentages by weight of various sizes of crushed rock that passed through screens ranging in size between four inches and number 200. It also has two columns showing that 80% of the rock is over 6 inches in size and 5% of the rock is between 4 and 6 inches in size.

The second page of the report contains a sketch of the quarry site beside the road and has 8 locations on it numbered in sequence. Below the map there is a "Test Hole Log."

"TEST HOLE LOG

| LAB NO. | TEST HOLE | |
|---|---|---|
| 252536 | 1 | 30.0'—Granite |
| 252537 | 2 | 30.0'—Granite |
| 252538 | 3 | 30.0'—Granite |
| 252539 | 4 | 30.0'—Decomposed Granite |
| 252540 | 5 | 30.0'—Decomposed Granite |
| 252541 | 6 | 30.0'—Granite |
| 252542 | 7 | 30.0'—Granite |
| 252543 | 8 | 30.0'—Granite |

This form is a standard lab report form used by the highway department and it is the same form that was used in the contract litigated in Haggarty Const. Co. v. State Highway Comm'n, 149 Mont. 422, 427 P. 686.

Highway Department geologists t e s t i f i e d they followed standard procedure in making their analysis of the quarry site. They climbed up the steeply sloping hill and took surface samples of about 50 pounds from each of the locations marked with numbers on the second page of the report. The samples were broken off rock ledges with a sledge hammer

and a pick and placed in sacks. All samples taken were sur-face samples even though the appellant included in its bid information the "Test Hole Log." The appellant's geologists testified that it was their practice, where there was a steeply sloping area, to only make surface reports, but no explanation was given why this practice was not communicated to bidders. During the pleading stage of the case the highway department amended their answer to remove their previous denial of the failure to drill holes, and admitted that no holes were in fact drilled to 30.0 feet, or to any other depth.

Mr. Kiely testified that his company relied on the materials report in preparing their estimates on the job. One of his employees testified that they worked directly from the report in preparing the estimates and they made only a cursory examination of the quarry site during the twelve day period they had to prepare their estimate.

The quarry site was filled with great boulders interpersed with sand and gravel. The rock was not a type of granite which would fracture when blasted or crushed. When the rock was blasted the boulders did not break up enough to be put into the crusher, and when the rock was crushed it would pulverize to form a coarse sand called fines, instead of the rough crushed gravel that was needed for the road subsurface.

Mr. Kiely testified that during crushing operations approx-imately one load of sandlike fines was hauled away from the crusher and dumped for each load of usable crushed rock produced. When highway engineers measured the principal pile of dumped fines they estimated it contained 23 to 25% of the total production of the crusher. Additional fines were deposited around the quarry site, and some of the fines were hauled away for use by the highway department in winter sanding operations. This sand was not intended to be used and could not be used in the concrete surfacing that was placed on the road.

As a result of the above described problems Kiely filed a claim for additional costs. The amount of the claim was based upon the highway department's determination of 25% reject fines even though Kiely's claim was higher. The claim included increased costs for additional crushing and blasting operations, for increased labor and machinery costs necessary to remove the lines allegedly caused by the highway department's misleading Test Hole Log information.

The plaintiff claimed that the highway department either through neglect or faulty practice misrepresented the actual condition of the quarry site, causing him to rely on a clear statement that test holes which had been drilled to 30 feet showed the presence of solid granite. His reliance on the report resulted in great additional expense to him when the quarry did not contain 30 feet of solid granite, but did contain large amounts of conglomerated boulders interspersed with sand, and great amounts of decomposed granite which did not crush properly.

Concerning this claim the highway department contends there is no proof that Kiely relied on the report, and that the report accurately represents the condition of the quarry because two of the 8 holes or 25% of the quarry contained decomposed granite which will produce excessive fines when crushed.

The other phase of the project for which Kiely filed an additional cost claim with the highway department arose out of the rejection by highway engineers of 5,796 yards of concrete aggregate sand Kiely had purchased from Tri-City Products in Anaconda and had hauled to Butte and stockpiled.

Shortly after the contract was awarded Kiely ordered all of the 9,000 yards of sand that would be required to make the concrete surfacing for the road. This sand was ready for Kiely on July 31, 1964 and he hauled about 2,000 yards of the 9,000 yards ordered. The sand was stockpiled and approved by the highway engineers for use in the project.

All sand used in the concrete surfacing was required to have a Fineless Modulus (F.M.) not in excess of 3.00. This measure-

ment is based on the coarseness of the sand. Sand finer than 3.00 has a higher F.M. number.

Due to the fact Kiely would not need to use the sand until the spring of 1965, and because he did not have to pay for it until it was hauled away from the Tri-City plant he discontinued hauling sand to Butte in 1964. In the spring of 1965 Kiely again hauled sand from the Tri-City plant at Anaconda. This sand had been manufactured later than the sand that had been hauled in 1964 because it was the practice of Tri-City Products to continuously pile sand of the same size on their stock piles rather than to make separate piles for each separate order they received.

Three thousand eight hundred yards of this additional sand were hauled to Butte in the spring of 1965 and were piled on top of the sand that had been hauled in 1964. On July 12, 1965 Kiely stopped hauling sand from Tri-City because he had received notice from the highway engineers that the 3,800 yards of 1965 sand exceeded the F.M. limits and were unacceptable. Five days later on July 17, 1965 Tri-City hired E. A. Nurse, President of Foundations and Materials Consultants, to test the sand pile at Butte. July 21, 1965 Kiely ordered 4,000 yards of sand from M & S Ready Mix Concrete in Missoula, some 100 miles distant. On July 22, 1965 Tri-City received the reports on the tests at the Butte sand pile but Kiely was not notified of the test results. Three of the samples had a F.M. number below 3.00 and indicated acceptable sand. The average F.M. number for all of the samples taken in the test indicated that the sand was acceptable.

After Kiely had ordered the sand from M & S Concrete at Missoula he began to bulldoze the 1965 sand off the pile and into a separate pile. By this action he hoped to salvage the previously accepted 1964 sand.

July 26, 1965 Foundations & Materials Consultants at Helena who had just made the report to the Tri-City Plant were hired by the highway department to test the sand at Butte and at the

Tri-City Plant at Anaconda. The sand at Butte was in two piles. The pile designated Kiely North contained principally 1964 sand, and the Kiely South pile was composed primarily of sand hauled in 1965. The tests were made by E. A. Nurse and a highway engineer. They collected samples and split each of them for testing. All samples tested by the highway department had F.M. numbers below 3.00, and only one sample tested by Nurse which came from the North pile composed principally of previously accepted sand had a F.M. number over 3.00.

E. A. Nurse testified that on July 28, he had carried the report of the tests to Lewis Chittim, the chief right of way engineer of the highway department, because "there was a big rush for it." On July 30, 1965 Chittim wrote a letter to Tri-City telling them the sand at both the Anaconda plant and in Butte was acceptable. On July 28 when Chittim received the results of the tests Kiely had not received any sand from Missoula, but Kiely was not notified of the results of the tests until September 23, 1965 when the project was almost completed.

Due to the fact that railroad cars were not immediately available to haul sand from M & S Concrete in Missoula and Kiely was not informed that the highway department had accepted the sand stock piles in Butte, the lack of suitable sand delayed the start of paving operations. All of these problems caused Kiely to import special cement finishers because there were not enough local people who could do this special work, and in addition he had to lease several large expensive pieces of special concrete paving equipment. Both men and equipment were essentially waiting in idleness for the sand to arrive and the paving operations to begin.

On July 29, 1965 Kiely hired Northern Testing Laboratories to test the sand piles in Butte. Their report dated July 30, 1965 indicates that 4 of the 8 samples they took had an F.M. number in excess of the acceptable 3.00. The other four samples were below 3.00. The average F.M. number was 2.97. Apparently the dozing operation which separated the two piles had blended

the sand enough to make it acceptable although Kiely was not notified that the highway would accept the sand until September 23, 1965.

At the trial was demonstrated that if the average F.M. ratings were taken for the different piles of sand at Butte, and the stockpile at Tri-City in Anaconda and these ratings were averaged together in their relative proportions of the total 9,000 yards required for the job, the whole amount of sand would have had an acceptable F.M. rating and could have been used. The sand at Butte was blended with the Missoula sand and eventually used in the project.

In response to a request of the highway department Kiely sent a breakdown of additional costs arising out of the sand pile debacle to Richard Dundas, district engineer for the state highway commission. This breakdown, dated April 14, 1966, contained a claim for freight in the amount of $6,200, a claim for equipment use of $7,259.85, a claim for standby time for special leased equipment of $20,089.90 and standby labor costs of $1,-705.81. With incidental costs the entire claim amounted to $38,439.04 for the additional sand costs.

The appellant presents fives issues for consideration on this appeal. For our purpose they will be consolidated into two main issues: (1) Did the court err in granting a directed verdict on claim one? (2) Is there sufficient evidence to support the jury verdict in the claim for additional funds for the sand?

Considering first the issue raised by appellant as to the sufficiency of the evidence to support the verdict on the quarry site claim we find that appellant failed to come forward with substantial evidence sufficient to overcome the trial court's action in granting a directed verdict. Over the past 4 years this Court, in three cases, Sandkay Const. Co. v. State Highway Comm'n, 145 Mont. 180, 399 P.2d 1002 (1965); Hash v. R. J. Sundling & Sons, Inc., 150 Mont. 388, 436 P.2d 83 (1967); Haggart Const. Co. v. State Highway Comm'n, 149 Mont. 422, 427 P.2d 686 (1967), has tried to set forth guidelines for these

type of cases—disputes between the State Highway Commission and those who contract with it. The Haggart and Sandkay cases, supra, were similar cases in that there as here, the state highway commission furnishing respondent with a materials report was to "induce bidders to submit a lower bid." Here the evidence clearly shows the respondent, who had but 12 days to prepare his bid, relied on the State's Material Report to his detriment and the trial court properly followed our holding in the Haggart case. The crucial question is one of justifiable reliance; and for the state to contend, as it did here, that the respondent had no reason to rely on its report that in its 8 test holes was 30 feet of granite is not reasonable. See also Wunderlich v. State ex rel. Dept. of Public Works, 65 Cal.2d 777, 56 Cal.Rptr. 473, 423 P.2d 545.

▆ The second issue presented attacks the sufficiency of the evidence presented to support the respondent's verdict on the sand claim. Again we find appellant's claim without merit. A brief resume of the respondent's evidence indicates that the appellant notified the respondent that its sand did not meet specifications. The contract was awarded December 18, 1963; February 20, 1964 the respondent ordered 9,000 cubic yards of sand from Tri-City Products, Inc., and hauled 1,996 yards to project site early in 1964; beginning on July 1, 1965 respondent began hauling some 3,800 cubic yards from Anaconda to the project site and piled it onto the previously hauled 1,996 yards; on July 12, 1965 the appellant's district engineer Dundas notified respondent Kiely that the 3,800 yards hauled in 1965 did not meet the specifications, that it was contaminated, that it could not be mixed with other sand, and that the state would not accept it. On July 17, 1965 upon being notified by respondent that the state had turned down the sand the president of Tri-City hired a private testing laboratory, Foundations and Materials Consulants, to make tests of respondent's sand at the project site at Anaconda, and the tests showed the sand at the project site was within specifications, however, the appellant

was not notified of such fact. On July 21, 1965, the respondent, ready with equipment and men to use the sand in concrete, located another source for sand and ordered 4,000 yards to be shipped to the project from Missoula. In the meantime, back at the state highway commission, the appellant through its chief of right of way engineer, on July 26 hired the same Foundation and Materials Consultants who had as previously reported on July 17 been hired by Tri-City, to make tests, and at the same time a representative of the state made tests and when completed all samples tested both by the private foundation and the state showed all samples under the 3.0 specification limit, and last but not least, a report was rushed to appellant's representative on July 28, 1965 with no copy to respondent who did not learn of the testing done or the results until September 23, 1965 when the job was practically done. It is interesting to note that nowhere in the appellant's case is there any explanation of the action taken by the district engineer Dundas in rejecting the sand nor was the man or men who made the tests on or before July 12th ever produced. On this record this Court is requested to find an insufficiency of evidence to support the verdict.

This Court will not upset a jury verdict if there is substantial evidence to support the verdict. Sumner v. Amacher, 150 Mont. 544, 437 P.2d 630; Greenup v. Community Transit Co., 145 Mont. 39, 399 P.2d 418; Wyant v. Dunn, 140 Mont. 181, 368 P.2d 917.

Judgment of the district court is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON, MR. JUSTICES HASWELL and CASTLES, and The HONORABLE LeROY L. McKINNON, District Judge, sitting in place of MR. JUSTICE JOHN W. BONNER, concur.