LittletoN, Judge,
delivered the opinion of the court:
Plaintiff seeks to recover additional compensation for extra work performed in reclearing certain areas in connection with its contract to clear an area in the vicinity of the Heyburn Dam Project. Plaintiff contends that it is entitled to the extra compensation on the ground that the order to reclear the area in question amounted to a change under Article 8 of the contract, or in the alternative, that the flood which occurred on May 19,1949, and which occasioned the extra work, was a changed condition within the meaning of Article 4 of the contract. Defendant urges that plaintiff has failed to establish a claim under either Article 8 or Article 4 of the contract.
On December 16, 1948, plaintiff entered into a contract with the Department of the Army, Corps of Engineers, Tulsa District, Tulsa, Oklahoma, under which plaintiff agreed to clear an area that was to become the reservoir of the Pleyburn Dam Project then being built on Polecat Creek near Heyburn, Oklahoma. The contract was awarded on the basis of competitive bidding. Plaintiff’s bid was $94,-958.50. The next lowest bid was approximately $121,000 and the estimate prepared by the Corps of Engineers had been $161,000.
*749 By the middle of May, 1949, the work had progressed in a satisfactory manner and approximately 33 percent of the entire clearing job was then completed. Plaintiff had received partial payments for the completed work as provided in Article 16 of the contract (finding 6). Article 16 (c) provided as follows:
(c) All material and work covered by partial payments made shall thereupon become the sole property of the Government, but this provision shall not be construed as relieving the contractor from the sole responsibility for all materials and work upon which payments have been made or the restoration of any damaged work, or as a waiver of the right of the Government to require the fulfillment of all of the terms of the contract.
On May 19,1949, a severe flood occurred in this area. Information available on floods in the area of Polecat Creek (contained in annual publications of the Department of the Interior) indicated that on only one prior occasion had the water level exceeded the level it reached in May of 1949, although in 1948 and in 1947 water levels reached stages not far from the stage reached in 1949 (finding 8). As a result of this flood, a large amount of floatable material was washed into the area which plaintiff had already cleared and for which it had received partial payment. In addition, debris consisting of trees, brush and other material which the plaintiff had cut or collected and put into piles sometime prior to the flood, was washed into areas which plaintiff was then in the process of clearing. Some of the material which was washed into the area was material which, under the terms of the contract, plaintiff had removed from the cleared area and would have burned in accordance with paragraph 1-03 of the specifications if it had not been for the flood on May 19.
While the area was at flood crest, plaintiff had discussions with representatives of the defendant and was advised that it would be required to clear up the area which had been previously cleared, but plaintiff was not told that it would be paid any additional compensation for such reclearing work. Plaintiff notified the representatives of defendant at the site of the work that in its opinion the additional work occasioned by the flood should be treated as an extra under *750 the contract and that plaintiff should be paid for doing such work.
Plaintiff was granted a 43-day extension of time within which to complete the work. Twenty-three days of the total time extension were allowed because of adverse weather conditions, and 20 days were allowed for the work of cleaning up after the flood.
On October 18, 1949, plaintiff presented a claim in the amount of $16,332.92 to the contracting officer for the cost of reclearing areas cluttered by the flood. Plaintiff urged its claim under Article 3 and Article 4 of the contract and submitted therewith a copy of its payroll and a statement of the expense of reclearing. On November 16, 1949, the contracting officer denied the plaintiff’s claim on the ground that the plaintiff had performed only the clearing work required by the contract and that under the terms of the contract the Government was not responsible for the additional expense caused by the flood. On December 13, 1949, the plaintiff appealed the contracting officer’s decision to the Chief of Engineers in Washington, D. C., and the contracting officer prepared findings of fact to accompany this appeal. A hearing was held before the Corps of Engineers’ Claims and Appeals Board at which testimony was taken and plaintiff was represented by counsel. The Board denied plaintiff’s claim on the ground that in its opinion Article 4 did not obligate the Government to compensate the contractor for additional clearing work not caused by the Government but brought about by an act of God in the form of a flood during the course of the work. It was the opinion of the Board that under Article 10 of the contract plaintiff had the responsibility of delivering the work complete and undamaged to the defendant and that the risk of damage to the work during the course thereof was assumed by the contractor. The Board did not discuss the theory of recovery advanced by plaintiff under Article 3 of the contract. Plaintiff filed two requests for rehearing which were denied.
Paragraph GC-3 of the contract specifications required the contractor to investigate the site and satisfy himself as to the nature and location of the work, general and local conditions, particularly those bearing upon, among others, *751 the disposal of material, the uncertainties of the weather, river stages, and similar conditions at the site. Paragraph GC-12 of the specifications required the contractor to keep the construction area, including storage areas used by him, free at all times from accumulations of waste material or rubbish. Paragraph 1-03 of the specifications provided that all material cleared from the specified area should be burned or completely removed by transporting it from the area. This paragraph provided that the burning or removal of material should follow as closely as practicable the clearing operations “so that in case of high water the brush or other debris will not obstruct or damage the outlet structure at the dam.” At various times prior to the flood in May 1949, representatives of the defendant had urged plaintiff to follow its clearing operations more closely with its burning operations.
The question for decision is, in general, who must bear the loss from a destruction of part of the work which the contractor has contracted to do while the work is still in an unfinished stage, where the destruction is brought about by an act of God and through no fault of either contracting party. We are of the opinion that under the circumstances of this case the requirement by the defendant that plaintiff reclear the area Avas not an order to perform extra work or a change in the plans and specifications requiring a change order within the meaning of Article 3 of the contract. The contract required that the area be cleared and that is all that the contracting officer ordered the plaintiff to do following the flood which damaged part of the area which had already been cleared. We are further of the opinion that the happening of the flood in May 1949 was not a “changed condition” within the meaning of Article 4 of the contract. This was an area which was subject to seasonal floods and the dam at the site was being constructed for the purpose of flood control. The information on floods which was available to the plaintiff, indicated that floods in that area in the summertime were to be expected. Furthermore, the provisions in the contract calling for the disposal of material cleared from the area so that, in the case of high water, the cleared material would not wash back into the area, indicate *752 that difficulties from flooding were within the contemplation of the parties when they entered into the contract.
If the contract in suit had provided for payment on the basis of the amount of materials the plaintiff removed from the area, and the flood had increased the amount required to be removed, then, of course, the Government would have had to pay for all materials actually removed, although the additional work was caused by an act of God in the form of a flood. Tacoma Dredging Co. v. United States, 52 C. Cls. 447. See also The Arundel Corporation v. United States, 103 C. Cls. 688 in which it was held that plaintiff was not entitled to an increase in the price per cubic yard of dredging material under the contract where a hurricane resulted in a smaller quantity of material to be dredged than had been estimated and anticipated under the contract.
Under the circumstances of this case, we are of the opinion that the only relief to which plaintiff was entitled under the contract, was the relief which was given it by the Government, that is, an extension of time for delays caused by the flood. Where the work was damaged before completion by the forces of nature and without anyone’s fault, plaintiff was under an obligation to repair such damage and complete the project as required by the contract. The Government was under no obligation to reimburse the plaintiff for the extra costs incurred in completing the contract work. De Armas v. United States, 108 C. Cls. 436.
The plaintiff is not entitled to recover and the petition is dismissed.
It is so ordered.
LaRamoRE, Judge; MaddeN, Judge; Whitakee, Judge; and Jokes, Chief Jxtdge, concur.
FINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and arguments of counsel, makes findings of fact as follows:
1. During all periods involved in this action, plaintiff, a partnership consisting of Jack Carman, George It. Carman, and Ralph R.. Kirchner, operated under the name of “Car- *753 man-Kirchner Construction Co.” with its principal office in Bristow, Oklahoma.
2. On December 16, 1948, plaintiff entered into Contract No. W-34-066-eng 1620, with defendant acting through the Department of the Army, Corps of Engineers, Tulsa District, Tulsa, Oklahoma, for a consideration of $94,598.50, which amount was later increased by Contract Modifications Nos. 2 and 5. The contract required plaintiff to clear the area that was to become the reservoir of the Heyburn Dam Project being built on Polecat Creek near Heyburn, Oklahoma. Hydrology studies were made a part of the plans and specifications for the construction of the dam. Such studies were not a part of plaintiff’s contract for the clearing of the dam area but they were available to the plaintiff for inspection.
3. The contract was awarded to plaintiff on the basis of competitive bidding, the plaintiff’s bid being approximately $94,958.50. The schedule of bids disclosed that the next lowest bid was approximately $121,000 and the Corps of Engineers’ estimate for the cost of the project was approximately $161,000.
4. The area to be cleared was divided into three zones, A, B, and C. The work was to commence within 10 days after receipt by the plaintiff of notice to proceed. All work in Zone A was to be completed in 160 days, Zone B in 290 days, and Zone C in 345 days. Notice to proceed was received by plaintiff on January 6, 1949, and the completion dates, as extended by subsequent modifications, were August 19, 1949, for Zone A, December 27, 1949, for Zone B and February 20, 1950, for Zone C. The contract provided for $25 in liquidated damages for each day of delay in completion of the project.
5. There were five modifications of the contract after the initial signing by the parties. Modifications 1, 3, and 4 extended plaintiff's time for completing the work and Modifications 2 and 5 increased the contract price. Each of these modifications was signed by the Contracting Officer, Bobert W. Noble, Corps of Engineers, Tulsa District.
6. The following provisions of the contract and specifications are quoted for ready reference:
*754 Aeticle 3. Changes. The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this Article must be asserted within 10 days from the date the change is ordered: Provided, however, That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the Secretary of the Army or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. Ir the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 15 hereof. But nothing provided in this Article shall excuse the contractor from proceeding with the prosecution of the work so changed.
Artiole 4 Changed conditions. Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the Contracting Officer shall be called immediately to such conditions before they are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the Secretary of the Army or his duly authorized representative, be modified to provide for an increase or decrease of cost and/or difference in time resulting from such conditions.
Article 5. Extras. Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the Contracting Officer and the price stated in such order.
Article ^. Delays — Damages. If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in the contract, or any extension thereof, or fails to complete said work within *755 such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby and for liquidated damages for delay as fixed in the specifications or accompanying papers, or if not so fixed any actual damages occasioned by the delay. If the contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event the contractor shall be liable to the Government for any damages resulting from the delay as hereinabove stated: Provided, That the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated or actual damages because of any delays in the completion of the work due to causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes. The Contracting Officer shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to. the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.
ARticle 10. Permits and responsibility for worJe. The contractor shall obtain all required licenses and permits. He shall be responsible for all damage to persons that occur as a result of his fault or negligence in connection with the prosecution of the work. Except for “Government property”, as defined in Article 29 (Liability for Government-furnished property), the respon *756 sibility for which is as stated in said article, the contractor shall be responsible for all loss or destruction of or damage to property that occurs as a result of his fault or negligence in connection with the prosecution of the work, and shall be responsible for all materials delivered and work performed until completion and final acceptance. Upon completion of the contract the work shall be delivered complete and undamaged.
ARTICLE 15. Disputes. Except as otherwise specifically provided in this contract, all disputes concerning the questions of fact arising under this contract shall be decided by the Contracting Officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative whose decision shall be final and conclusive upon the parties hereto. In the meantime the contractor shall diligently proceed with the work as directed.
Article 16. Payments to contraetor. (a) Unless otherwise provided in the specifications, partial payments will be made as the work progresses at the end of each calendar month, or as soon thereafter as practicable, on estimates made and approved by the Contracting Officer. In preparing estimates the material delivered on the site and preparatory work done may be taken into consideration.
(b) In making such partial payments there shall be retained 10 percent on the estimated amount until final completion and acceptance of all work covered by the contract: Provided, however, That the Contracting Officer, at any time after 50 percent of the work has been completed, if he finds that satisfactory progress is being made, may make any of the remaining partial payments in full: And provided further, That on completion and acceptance of each separate building, vessel, public work, or other division of the contract, on which the price is stated separately in the contract, payment may be made in full, including retained percentages thereon, less authorized deductions.
(c) All material and work covered by partial payments made shall thereupon become the sole property of the Government, but this provision shall not be construed as relieving the contractor from the sole responsibility for all materials and work upon which payments have been made or the restoration of any damaged work, or as a waiver of the right of the Government to require the fulfillment of all of the terms of the contract.
(d) Upon completion and acceptance of all work required hereunder, the amount due the contractor under *757 this contract will be paid upon the presentation of a properly executed and duly certified voucher therefor, after the contractor shall have furnished the Government with a release, if required, of all claims against the Government arising under and by virtue of this Contract, other than such claims, if any, as may be specifically excepted by the contractor from the operation of the release in stated amounts to be set forth therein.
GC-3. Site INVESTIGATION AND REPRESENTATIONS. The contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling and storage ox materials, availability of labor, water, electric power, and roads, uncertainties of weather, river stages, tides or similar physical conditions at the site, the conformation and condition of the ground, the character, quality and quantity of surface and subsurface materials to be encountered, the character and equipment and facilities needed preliminary to and during the prosecution of the work and all other matters which can in any way affect the work or the cost thereof under this contract. Any failure by the contractor to acquaint himself with all the available information concerning these conditions will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for any understanding or representations made by any of its officers or agents during or prior to the negotiation and execution of this contract, unless (1) such understanding or representations are expressly stated in the contract and (2) the contract expressly provides that the responsibility therefor is assumed by the Government. Representations made but not so expressly stated and for which liability is not expressly assumed by the Government in the contract shall be deemed only for the information of the contractor and the Government will not be liable or responsible therefor.
GC-6. PROGRESS Charts, AND ReqtjiremeNts eor Overtime Work, (a) The contractor shall within five days or within such time as determined by the Contracting Officer, after date of commencement of work, prepare and submit to the Contracting Officer for approval a practicable schedule, showing the order in which the contractor proposes to carry on the work, the date on which he will start the several salient features (including procurement of materials, plant and equipment) and the contemplated dates for completing the same. The sched *758 ule shall be in the form of a progress chart of suitable scale to indicate appropriately the percentage of work scheduled for completion at any time. The contractor shall enter on the chart the actual progress at the end of each week or at such intervals as directed by the Contracting Officer, and shall immediately deliver to the Contracting Officer three copies thereof.
GO-12. CLEANING Up. The contractor shall at all times keep the construction area, including storage areas used by him, free from accumulations of waste material or rubbish and prior to completion of the work remove any rubbish from and about the permises and all tools, scaffolding, equipment and materials not the property of the Government. Upon completion of the construction the contractor shall leave the work and premises in a condition satisfactory to the Contracting Officer.
SC-19. Final Examination and Acceptance. As soon as practicable after the completion of the entire work or any divisible part thereof as may be determined by the Contracting Officer, a thorough examination thereof will be made by the Contracting Officer at the site of the work. If such work is found to comply fully with the requirements of the contract, it will be accepted, and final payment thereof will be made in accordance with Article 16 of the contract.
1-03. Disposal op MateRial.
a. All material cleared from the specified area shall be burned or completely removed by transporting from the Government right-of-way limits, * * *. The burning, removal, or other specified disposal of material shall follow as clearly as practicable the clearing operations so that in case of high water the brush or other debris will not obstruct or damage the outlet structure at the dam. The time, location, and amount of burning to dispose of cleared materials shall be subject to the approval of the Contracting Officer. * * *
7. Plaintiff began the work on schedule and proceeded in a satisfactory manner. Plaintiff kept progress charts as required by the specifications. Progress charts were also kept by the Corps of Engineers. These charts show that on May 19,1949, approximately 33% of the entire job was completed on the following basis — 50% of Zone A, 30% of Zone B, and 2 or 3% of Zone C. On the basis of these percentages, plaintiff received partial payments as provided in Article 16 of the contract.
*759 8. Plaintiff’s claim is based on a flood which occurred in the Polecat Creek area on May 19,1949. Floods in this area were fairly common and it was for purposes of flood control that the dam was being built. The records of prior floods over a period of many years show only one prior occasion when the water on Polecat Creek was higher than in May 1949, i. e., in September 1940.
Information on floods of Polecat Creek is contained in annual publications of the Department of the Interior entitled “Surface Water Supply of the United States, Part 7 Lower, Mississippi Liver Basin. Geological Survey Water-Paper.” Volumes for the years 1948 and 1949 are in evidence. The 1949 volume (p. 184) shows that the maximum height of the May 19,1949 flood was 28.53 feet above the creek bed. The 1948 volume (p. 178) shows that the highest flood for that year occurred on June 23, 1948, and reached a maximum height of 28.18 feet. The highest recorded flood on Polecat Creek occurred on September 4, 1940, when a maximum height of 31.50 feet was reported.
The four highest recorded floods on Polecat Creek from 1940 through 1949 are as follows:

Date Height (stage in feet)

Sept. 4, 1940-_ 31.50
May 19, 1949-_ 28.53
June 23, 1948 _ 28.18
May 9, 1943— - 27.60
9. The May 19,1949 flood washed a large amount of float-able material into the area which plaintiff had previously cleared and part of the area which plaintiff was in the process of clearing. Some of this debris consisted of trees, brush and other material which plaintiff had cut or collected and put into piles prior to the time of the flood. Some of the debris came from areas outside or beyond the zones which plaintiff was required by the contract to clear. The contract required plaintiff to burn or otherwise dispose of cleared materials as soon as practicable and defendant’s representatives had requested plaintiff to follow its clearing operations more closely with its burning operations. The flood assisted plaintiff’s clearing operations to a limited extent in that it washed out of plaintiff’s area some material that plaintiff *760 otherwise would have had to burn or remove, but on the whole the flood caused the plaintiff to perform additional work.
10. While the area was at flood crest, and during the following few days, discussions were held, with respect to the damage caused by the flood, between representatives of the plaintiff and the defendant. Plaintiff was informed that it would be required to re-clear the area, which had been previously cleared, but was never definitely told that it would be paid additional compensation for this extra work. The defendant’s representatives were aware of the conditions existing as a result of the flood.
11. Before the plaintiff commenced any re-clearing after the flood, plaintiff informed the defendant’s representatives that plaintiff considered such work additional to the requirements of the contract and that plaintiff expected to be paid for the re-clearing by an equitable adjustment of the contract price. At about that time plaintiff wrote, to defendant’s Resident Engineer, a letter of inquiry concerning the work expected of him and the Resident Engineer in turn advised the plaintiff that plaintiff would be required to perform the work of removing the debris from the area previously cleared and that some of the stumps would require additional cutting away.
Plaintiff’s letter dated May 28,1949, is quoted as follows:
The severe rains this month have washed in considerable trash and deposited it over areas in the Heyburn reservoir which we had been over with the pickup crew. The area before this month was in fine shape, and we presume had your approval. Much of the trash, we believe you will agree, washed in from beyond our zones. The high water also washed the sandy soil from around many of the stumps, leaving much of the root structure exposed.
Since this damage to the reservoir was an act of God and beyond our control, we would appreciate your idea or ruling on whether we would be expected to recut the stumps on creek banks and redo the pickup work.
The Resident Engineer’s reply was as follows:
Reference is made to your letter of 28 May 1949 requesting a ruling as to whether you would be expected to recut stumps exposed by erosion during the May flood *761 and to pickup and dispose of trash washed in by the flood.
Upon completion of the entire work, a thorough examination thereof will be made by the contracting officer. If such work is found to comply fully with the requirements of the contract, it will be accepted.
Trash that may have been washed into the work area will have to be removed. However it is believed that the flood has helped as much as it has hindered your operations by bunching small floatable materials and also by washing considerable amounts downstream and completely out of the clearing areas.
It is felt that stumps that were properly cut and then further exposed by flood waters may not require additional cutting, but this is not final as each situation will be considered separately, depending on location.
12. As a result of the flood, plaintiff was required to clear debris from some areas that had been previously cleared. Plaintiff did not clear any area which the contract did not require to be cleared but some of the area had to be cleared a second time because of the flood.
After the flood, plaintiff was, by Modification No. 4 to the contract, granted a 43-day extension of time within which to complete the work.
13. Upon completion of the re-clearing work, and when the costs incident thereto could be accurately determined, plaintiff, under date of October 18, 1949, sent to the Resident Engineer statements of records and costs beginning June 18 through August 26, 1949, and requested payment. The Resident Engineer, on October 17, 1949, returned the letter and records to the plaintiff and requested a letter in the form of a claim stating “the reasons for believing that you are entitled to extra payment.”
14. By letter of October 18,1949, plaintiff presented a claim for $16,332.92, the alleged cost of re-clearing areas cluttered by the flood. In support of its claim, plaintiff stated that “changes and changed conditions were brought about by floods, which were an act of God, over which neither of the contracting parties had control.” Plaintiff submitted with the claim a copy of its payrolls and a statement of expenses.
15. By letter of November 18, 1949, the contracting officer advised plaintiff that, on November 14, 1949, the work had *762 been inspected and found to be in accordance with the contract requirements and that, therefore, final acceptance was given as to that date.
16. By letter of November 16, 1949, the contracting officer denied plaintiff’s claim on the grounds that plaintiff performed only the clearing required by its contract and that, under the contract, the Government was not responsible for any additional expense caused by the flood.
17. By letter of December 13, 1949, plaintiff appealed the Contracting Officer’s decision to the Chief of Engineers in Washington, D. C. Under date of December 28, 1949, the Contracting Officer prepared findings of fact to accompany this appeal.
18. On October 2,1950, the Corps of Engineers Claims and Appeals Board, after a hearing at which plaintiff was represented by counsel, presented testimony and affidavits and filed a brief, rendered a decision and opinion affirming the decision of the Contracting Officer. Plaintiff filed two requests for rehearing which were both denied.
19. Plaintiff was aware that only the contracting officer could grant additional compensation or modify the contract. Plaintiff did not obtain a decision of the contracting officer or appeal the Resident Engineer’s ruling that plaintiff would have to remove trash washed into the work area. Plaintiff did expect to be paid for the additional work and the subject was discussed by representatives of plaintiff and defendant on several occasions. It is established by the evidence that special or separate records were kept by the defendant with respect to the extra work caused by the flood waters in May 1949. Plaintiff interpreted the keeping of such records by the defendant, as an indication that payment would be made for the extra work caused by the heavy rainfall in May 1949, when considered in the light of all circumstances involved.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.