No. 13699

IN THE SUPREME COURT OF THE STATE OF MONTANA

1978

SORNSIN CONSTRUCTION COMPANY,
a North Dakota corporation,

Plaintiff and Respondent,

-vs-

THE STATE OF MONTANA; and THE DEPARTMENT
OF NATURAL RESOURCES AND CONSERVATION,
an administrative agency of the State of
Montana,

Defendants and Appellants.

Appeal from:   District Court of the First Judicial District,
               Honorable Gordon R. Bennett, Judge presiding.

Counsel of Record:

    For Appellants:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Allen B. Chronister argued, Assistant Attorney General,
         Helena, Montana
        Garrity and Keegan, Helena, Montana
        Donald A. Garrity argued, Helena, Montana
        Ted Doney, Helena, Montana

    For Respondent:

        Scribner and Huss, Helena, Montana
        Walker and Grover, Denver, Colorado
        Philip E. Riedesel argued, Denver, Colorado

                              Submitted:  October 19, 1978
                              Decided: DEC 2 8 1978

Filed: DEC 2 8 1978

_Thomas J. Kearney_
                                    Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Plaintiff, Sornsin Construction Company, brought this action in the District Court of the First Judicial District to recover damages for the alleged breach of a contract for the construction of an irrigation pump system on the Yellowstone River near Sidney, Montana. From a judgment for plaintiff, defendant State of Montana appeals.

On July 28, 1970, the Montana Water Resources Board (MWRB) (now the Department of Natural Resources and Conservation) issued an invitation for bids on a contract for the construction of an irrigation pump system project. The project entailed constructing three river pump units to pump water from the Yellowstone River and four relift pump stations to pump the water from the river units into various irrigation canals. The project was designed by the Portland, Oregon, design unit of the United States Department of Agriculture Soil Conservation Service.

Plaintiff received a number of plans, specifications and drawings from the MWRB which it used in preparing its bid. After the contract had been awarded to plaintiff and work had begun, it became apparent that a number of specifications were only approximations. Specifically, the listed elevations for the river bed, in the neighborhood of 1880 feet, varied from the actual elevations as much as 15 feet. These discrepancies resulted in increased costs to plaintiff. In addition, a number of other claims developed through the course of performance of the contract which defendant refused to compensate. Plaintiff sued, and a jury trial commenced on April 12, 1976, continuing through May 6, 1976. The jury awarded damages to plaintiff in the amount

of $335,328 plus $6,751.05 in costs. The original bid submitted by plaintiff and accepted by defendant had been $962,108.40.

The issues raised by appellant on appeal are:

1. Did Sornsin Construction Company assume the risk of failure of its proposed cofferdam designs?

2. Did Sornsin Construction Company assume the risk that the material to be excavated at Pump Unit 3 might not stand on a vertical cut?

3. Was the giving of Instruction No. 22 error?

4. Under the terms of this contract, was the contractor responsible for damage prior to acceptance?

5. Is a contractor who bids on an item, knowing that the quantity listed for that item is wrong, entitled to recover lost profits on the excess quantity?

6. Did Sornsin Construction Company prove that material suitable for compacted granular earth fill was not available at the site of Pump Unit 1-A?

7. May the contractor recover for extra work not covered by a change order?

8. Did the District Court err by admitting plaintiff's Exhibit Nos. 119, 131 and 141 in evidence?

9. Did the District Court err by refusing to admit defendant's Exhibit No. 555 in evidence?

10. Is the verdict and judgment supported by the evidence?

The parties agree only on the statement of Issue Nos. 3, 8, 9, and 10. As a result, in the discussion of all issues, the issues will be presented in pairs to emphasize the alternative positions of the parties.

Issue 1

Prior to discussion of Issue No. 1, we set forth the general principle as stated in Big Sky Livestock, Inc. v. Herzog (1976), 171 Mont. 409, 558 P.2d 1107, 1110, 33 St.Rep. 1232, 1236, that the role of the reviewing court is to limit its review to whether there is substantial credible evidence to support the verdict. In so doing, it will review the evidence in the light most favorable to the prevailing party. See Davis v. Davis (1972), 159 Mont. 355, 497 P.2d 315, and State Highway Commission v. Vaughan (1970), 155 Mont. 277, 470 P.2d 967.

D-1. Did Sornsin Construction Company assume the risk of failure of its proposed cofferdam designs?

P-1. Did the State breach its warranty of accuracy and sufficiency of its plans and specifications; were there "differing site conditions"; if so, did the State breach the contract by failing to pay therefor?

Defendant argues that plaintiff assumed the risk that its original cofferdam plans would not work.

Plaintiff responds by asserting that defendant breached its warranty regarding plans and specifications; there were "differing site conditions", and defendant is estopped from so denying.

This issue involves the three river pump units. To construct these units, it was necessary to first remove the water from the area using cofferdams. The river bed turned out to be lower than plaintiff anticipated resulting in having to utilize larger and more expensive cofferdams.

The State admits the plans from which plaintiff drew its estimates were not consistent with respect to the eleva-

tion of the river bed. The State goes on to argue, however, that this discrepancy in the plans should have put plaintiff on notice to make further inquiry, pursuant to Clause 12 of the general provisions of the contract:

"12.  CONDITIONS AFFECTING THE WORK.
        The Contractor shall be responsible for having taken steps reasonably necessary to ascertain the nature and location of the work, and the general and local conditions which can affect the work or the cost thereof. Any failure by the Contractor to do so will not relieve him from responsibility for successfully performing the work without additional expense to the Contracting Local Organization. The Contracting Local Organization assumes no responsibility for any understanding or representations concerning conditions made by any of its officers or agents prior to the execution of this contract, unless such understanding or representation are expressly stated in the contract."

The other clause pointed out by the State along this same line is Clause 2:

"2.  SPECIFICATIONS AND DRAWINGS
        The Contractor shall keep on the work a copy of the drawings and specifications and shall at all times give the Contracting Officer access thereto. Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawing and specifications, the specifications shall govern. In case of discrepancy either in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing. Any adjustment by the Contractor without such a determination shall be at his own risk and expense. The Contracting Officer shall furnish from time to time such detail drawings and other information as he may consider necessary, unless otherwise provided."

Finally, the State's argument turns to the competitive element involved in the bidding process and the attendant assumption of risk where one balances the risk involved in predicting what something will actually cost against the risk of losing the contract if one minimizes the risk in the first part too greatly.

The State, citing Haggart Construction Company v. State Highway Commission (1967), 149 Mont. 422, 427 P.2d 686, asserts that the crucial question of the contractor's right to recover for misrepresentations in the plans is one of "justified reliance."

Plaintiff argues that there were portions of the plans which expressly misstated certain elevations on which the cofferdams were to sit. Furthermore, construction experts at trial seemed to agree that plaintiff's reliance on the plans without the further investigations suggested by the State was reasonable. Plaintiff feels Clause 4 of the contract is most applicable to this issue:

> "4.   DIFFERING SITE CONDITIONS
>           (a) The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether or not changed as a result of such conditions, an equitable adjustment shall be made and the contract modified in writing accordingly."

Plaintiff gave proper notice, and the Contracting Officer for the State responded by letter on December 30, 1970. Among other things, he stated:

> "After investigation, it is agreed that, while some change in the river bed level and configuration could be normally expected, the existing depth as compared to that indicated on the drawings is materially different so as to constitute a differing site condition under the terms of Clause 4 of General Provisions . . ."

The State withdrew this determination six months later, and no price adjustment was made.

The law is established that a contractor can rely on the plans and specifications and need not, as alleged by the State here, verify them. It has long been recognized that the owner, here the State, warrants and is responsible for the accuracy of the descriptions in the plans and specifications of the contract that are issued. See Haggart Construction Company v. State Highway Commission, supra; Halvorson v. United States (Ct.Cl. 1972), 461 F.2d 1337.

Section 4(a) of the Differing Site Conditions clause of this contract hereinbefore cited, formerly known as the Changed Conditions clause in government contracts, is the most applicable to this situation. In Farnsworth & Chambers v. United States (Ct.Cl. 1965), 346 F.2d 577, 580-81, the court said:

> "The contractual requirement that plaintiff make its own investigation of the site does not obliterate the Changed Conditions clause nor did this requirement obligate bidders to discover, at their peril, subsurface conditions hidden by the river's water and thus unavailable to any reasonable pre-award inspection."

The exculpatory clauses in the contract relied upon by the State do not, as a matter of law, waive, eliminate, or modify the contractor's right to rely on the representations made in the plans or specifications nor its right to rely on the Differing Site Conditions clause. Haggart Construction Company v. State Highway Commission, supra; Morrison-Knudsen v. United States (Ct.Cl. 1965), 345 F.2d 535; Fehlhaber Corp. v. United States (Ct.Cl. 1957), 151 F.Supp. 817; and Farnsworth v. United States, supra. In Haggart Construction, 149 Mont. at 687, 688, case cited above, this Court recognized that the owner cannot be allowed to rely on the exculpatory provisions, citing Sandkay Const. Co. v. State (1965), 145 Mont. 180, 399 P.2d 1002, and said:

"Or to state it with a more particularity, where plans and estimates or specifications are used as the basis for bids, [it] is a contractor who has been led to believe that the conditions indicated in such plans exist, [and is] able to rely on them and recover for expenses necessary by conditions being other than as represented in such plans."

The reason for the Differing Site Conditions clause of a contract is to eliminate the contractor's risk of an unanticipated subsurface condition and still allow the government to avoid the unnecessary expense of the contractor including a contingency amount in his bid for possible unanticipated subsurface conditions. See Foster Construction Company v. United States (Ct.Cl. 1970), 435 F.2d 873, 887.

The State in its citation of authority relied upon the cases of Austin Company v. United States (Ct.Cl. 1963), 314 F.2d 518, and Beacon Construction of Massachusetts v. United States (Ct.Cl. 1963), 314 F.2d 501. Neither of these cases are factually similar to the situation in this case on the point of the assumed risk by the contractor. In Austin the contractor, not the owner (the state as here), prepared the plans and specifications and promised to perform under those specifications--those are not the facts in this case. In Beacon the evidence indicated that the contractor was aware of the ambiguities prior to bidding-that is not the case here.

The State argues that Sornsin could not "justifiably rely" on the plans because it alleges that the plans do not show elevations in the areas where the cofferdams were to be placed and the plans had significant discrepancies. As previously set forth, the evidence simply does not support those allegations. There was justifiable reliance on the

-8-

river bed elevations as shown on the proper sheets of the plans submitted.

## Issue 2

D-2. Did Sornsin Construction Company assume the risk that the material to be excavated at Pump Unit 3 might not stand on a vertical cut?

P-2. Did the State breach its warranty of accuracy and sufficiency of its plans and specifications; were there "differing site conditions"; if so, did the State breach the contract by failing to pay therefor?

This issue involves the necessary excavation at Pump Unit 3. The design for this unit called for excavation of a trench from the river into the bank to permit installation of the pipe and pumping apparatus of the unit. The plans for Pump Unit 3 indicated an excavation pay line (an "excavation pay line" establishes the area of excavation for which the contractor will be paid) on a 1.1 slope for the first twenty feet of the excavation and a vertical pay line for the remaining twenty-two feet of the excavation. Rock was not encountered until some fourteen or fifteen feet below the level where the drawings indicated the vertical pay line was to begin. Plaintiff sought damages for the costs of its excavation beyond the vertical pay line on the theory that drawing such a pay line constituted a warranty that the earth in that area was rock capable of being excavated on a 90° angle. Plaintiff's argument with respect to this issue parallels the argument regarding the cofferdams in Issue 1. The additional element in this situation seems to be Clause 17 of the general conditions of the contract. Defendant relies heavily on this clause:

-9-

"17. RECORDS OF TEST PITS AND BORINGS
     The Contracting Local Organization does
not represent that the available records show
completely the existing conditions and does not
guarantee any interpretation of these records.
The Contractor assumes all responsibility for
deductions and conclusions as to the nature of
rock and other materials to be excavated, the
difficulties of making and maintaining the re-
quired excavations and of doing other work af-
fected by the geology of the site of the work,
and for the final preparation of the foundations
for the spillway, dikes, and other structures."

Plaintiff argues that this clause is not referring to

interpretations made by the owner's designers, but merely

contractor interpretations. Moreover, plaintiff argues that

the Differing Site Conditions clause supersedes this clause.

In support of this assertion, plaintiff cites Foster Con-

struction C.A., et al. v. United States (Ct.Cl. 1970), 435

F.2d 873, 888:

"Even unmistakable contract language in which
the Government seeks to disclaim responsibility
for drill hole data does not lessen the right
of reliance. The decisions reject, as in con-
flict with the changed conditions clause, a
'standard mandatory clause of broad application,'
the variety of such disclaimers of responsibility
--that the logs are not guaranteed, not repre-
sentations, that the bidder is urged to draw his
own conclusions." (Citations omitted.)

The State does not address this authority nor any of

the other arguments made by plaintiff in its reply brief.

We hold that the State failed to overturn the finding with

respect to this issue.


Issue 3

We next direct our attention to Issue No. 3 wherein the

State alleges error by the giving of Instruction No. 22

which reads:

"One of the plaintiff's claims is for damages for
the increased costs of placing riprap at Pump
Unit No. 1, alleged to have been incurred because
of the owner's alleged delay in consenting to the

removal of the old pump house at that location.
In your consideration of this claim, you should
take into account the provisions of paragraph
7(a)2 of the Specifications for Structure Removal
reading in part as follows:

"'7(a) 2 Except for the existing transformer
base at Pump Unit No. 1, the existing pumping
plants shall be left intact and kept in operation
until the replacement pumping plants are installed
and operable.  The time for removal and salvaging
or disposal of existing facilities shall be as
directed by the Contracting Officer.  The concrete
transformer base can be removal [sic] at any time
after the transformers are relocated.  Relocating
the transformers is not a part of this contract.'

"You are instructed that provisions such as this
one, prohibiting a contractor from performing cer-
tain work without the owner's consent, do not per-
mit the owner to withhold consent unreasonably,
or to delay giving consent for an unreasonable
period of time.  Therefore, if you find that such
consent was unreasonably withheld or delayed by
the owner in this case, you may consider whether
the withholding or delay in giving such consent
caused damage to the contractor, and if so, the
amount of the damages sustained thereby."

Defendant argues that the court altered the clear

meaning of this provision of the contract by suggesting,

through this instruction, that the existing pumping plants

could be removed if such removal would be "reasonable", in

which event the owner had a duty to promptly consent.

Plaintiff emphasizes the sentence in the contract

stating the time for removal shall be "as directed by the

Contracting Officer".  The consent was finally given before

the replacement pump was operable lending credence to plain-

tiff's assertion that the Contracting Officer's understanding

of this contractual provision was the same as plaintiff's.

Again, defendant did not respond to plaintiff's arguments.

We find no error.


Issue 4

This issue is directed to the responsibility of either

plaintiff or the State for damage to the project prior to

acceptance:

-11-

D-4. Under the terms of this contract, was the contractor responsible for damage prior to acceptance?

P-4. Did the State breach its warranty of adequacy of design for the riprap work, and did the risk of loss pass to the State once this work had been accepted as fulfilling the State's specifications?

In the winter of 1971-1972, a massive ice breakup on the Yellowstone River dislodged some 150 cubic yards of the rock riprap which had been installed at Pump Unit 1. (Riprap is a foundation or sustaining wall of stones thrown together without order, as in deep water or on an embankment slope to prevent erosion.) Plaintiff alleged in its amended complaint that the damage resulted because of the State's defective design but apparently offered no proof of that allegation. Instead plaintiff relied on the fact that this work was completed to the State's specifications and paid for prior to the damage.

The State relies on two provisions of the contract. The first is Clause 11:

> "11. PERMITS AND RESPONSIBILITIES
> The Contractor shall, without additional expense to the Contracting Local Organization, be responsible for obtaining any necessary license and permits, and for complying with any applicable Federal, State, and municipal laws, codes, and regulations, in connection with the prosecution of the work. He shall be similarly responsible for all damages to persons or property that occur as a result of his fault or negligence. He shall take proper safety and health precautions to protect the property of others. He shall also be responsible for all materials delivered and work performed until completion and acceptance of the entire construction work, except for any completed unit of construction thereof which theretofore may have been accepted." (Emphasis added.)

The other provision of the contract cited by the State is Clause 7, part (d):

-12-

"7. PAYMENTS TO CONTRACTOR

". . .

"(d) All material and work covered by progress
payments made shall thereupon become the sole
property of the Contracting Local Organization,
but this provision shall not be construed as
relieving the Contractor from the sole responsi-
bility for all material and work upon which pay-
ments have been made or the restoration of any
damaged work, or as waiving the right of the
Contracting Local Organization to require the
fulfillment of all of the terms of the contract."

Plaintiff's argument is that the State warranted the
adequacy of its plans and specifications. The fact that the
riprap was damaged by the force it was designed to sustain
is the extent of the proof offered by plaintiff that the
design was defective. Plaintiff further argues that the
riprap was a "completed unit" which had been accepted.

Clause 11 of the general provisions of the contract
provided that the contractor "shall also be responsible for
all materials delivered and the work performed until the
completion and acceptance of the entire construction work,
except for any completed unit which theretofore may have
been accepted." No unit of the project, including the
riprap at Pump Unit 1, was accepted before November 2, 1972.
Clause 7 of the general provisions of the contract care for
this issue and these provisions fairly place the risk of
damage prior to acceptance of the work upon the contractor.
DeArmis v. United States (Ct.Cl. 1947), 70 F.Supp. 605, is a
case where a storm damaged the contractor's partially completed
jetty at the mouth of the Mississippi River. The contractor
filed a claim for additional compensation for this work in
repairing the damage. The Court of Claims denied recovery
stating:

-13-

"The question then, is, who must bear the loss from a destruction of a part of the work which the plaintiff had contracted to do, while that work was in an unfinished stage . . . The specifications as to final examination and acceptance certainly contemplated that the work should stand in place in a useful condition when the contract was completed. We think, therefore, that its being damaged by forces of nature and without anyone's fault before it was completed and accepted as complete, was the plaintiff's misfortune and loss." 70 F.Supp. at 606.

See also John McShain, Inc. v. United States (Ct.Cl. 1967), 375 F.2d 829; Amino Brothers Co. v. United States (Ct.Cl. 1967), 372 F.2d 485; Carman v. United States (Ct.Cl. 1958), 166 F.Supp. 759.

We find that the work being damaged by forces of nature and without anyone's fault before it was completed and even though accepted as complete, was the plaintiff's misfortune and it must suffer the loss. This is in accord with the general rule, applicable to both private and public building contracts, that one who contracts to erect a structure must bear the loss occasioned by an accidental destruction or damage before completion. See 13 Am.Jur.2d Building and Construction Contracts §64, and 64 Am.Jur.2d Public Works and Contracts §115.


Issue 5

D-5. Is a contractor who bids on an item, knowing that the quantity listed for that item is wrong, entitled to recover lost profits on the excess quantity?

P-5. Whether the Contracting Officer paid plaintiff an equitable price adjustment for the quantity of miscellaneous metal?

Clause 28 appears to be the controlling clause in this issue. It provides for a variation of 25 percent which the

plaintiff's estimator was aware of at the time of the bid and a quantity that he set forth was only an estimate subject to quantity variations. It would appear he logically did not believe this difference of his estimate and that of the State's was of any significance.

We note that perhaps the real point at issue here is whether or not the Contracting Officer paid plaintiff an equitable price adjustment. The Contracting Officer agreed that was the only issue in his letter dated November 22, 1971, in which he responded to Sornsin's rejection of the 63 cents per pound for the steel. Part of that letter provided:

> "As provided in the terms of the contract, would you please furnish us a detailed breakdown describing your costs information in support of your suggested price unit of $1.10 a pound. We will need this information in order to make a decision on the unit price."

At trial plaintiff presented testimony that the actual cost was set forth in the final cost report and submitted data in support thereof.

The Supreme Court in United States v. Callahan Walker Construction Co. (1942), 317 U.S. 56, 61, 63 S.Ct. 113, 115, 87 L Ed 2d 49, 53, stated that "[a]n 'equitable adjustment' of the respondent's additional payment for extra work involved merely the ascertainment of the cost of digging, moving, and placing earth, and the addition to that cost of a reasonable and customary allowance for profit." In Bruce Construction v. United States (Ct.Cl. 1963), 324 F.2d 516, the court held that a proper measure is the "reasonable cost" and declared that to be "there is a presumption that the actual costs paid are reasonable." That presumption must be overcome by whichever party alleges its unreasonableness. Here, plaintiff proved that the claim was reasonably incurred and that they were prima facie reasonable costs. Thus, the State, having failed in its burden of proving these costs unreasonable, must fail at this issue.

-15-

Issue 6

D-6.  Did Sornsin Construction Company prove that material suitable for compacted granular earth fill was not available at the site of Pump Unit 1-A?

P-6.  Was evidence introduced at trial from which the jury could find that there was not sufficient granular earth fill material at the site?

Both a letter of Sornsin dated December 24, 1970, and testimony given at the time of trial indicated that the material at the site was not suitable for compaction.  In the December 24 letter the Contracting Officer of the State was advised that "there appears to be a question that the available dry granular material is too fine for compacted granular fill.  We also noted considerable amount of coal while drilling the test hole a week from the last Wednesday.  This coal appeared with the coarser gravel underneath the gravel bed."  In his testimony at trial Sornsin confirmed the unsuitable conditions when he testified:

> "Well, the site, the topsoil, the top section of
> the soil above the river level was just like a
> blow sand.  There was a noncompactable material
> and then, when we got down deeper we got into the
> coarse gravel and that gravel had a lot of lignite
> coal--you know what lignite coal is--particles
> throughout it.  During a conversation out on the
> job site on December 16th, Mr. Fisher told me that
> the material could not be used for granular back-
> fill at this site, as so stated on the plan."

With this testimony and the reference to the letter of December 24, 1970, there was sufficient evidence that the jury could weigh as to the sufficiency of the granular earth fill material and make a decision.  We find no error.


Issue 7

D-7.  May the contractor recover for extra work not covered by a change order?

P-7. Did the State breach its warranty of accuracy and sufficiency of its plans and specifications; were there "differing site conditions"; if so, did the State breach the contract by failing to pay therefor?

We note first that it is amazing that this point is raised by the State, for here the evidence indicates that the State unreasonably delayed preparing modified plans for well over a year. The Contracting Officer admitted in his testimony that it "wouldn't be unreasonable" for plaintiff to keep trying to make the effective plan work until it was given a written change order. With this background, it is slightly amazing that the State raises the point at all. We note further that the State, in citing Diamond v. United States (1943), 98 Ct.Cl. 428, and Pope v. United States, 76 Ct.Cl. 64, 97, relies on old cases which do not involve contracts which have either the "constructive change" or "differing site conditions" clauses in them. The only other case cited by the State in support of this issue is L.I. Waldman Co. v. State (1960), 202 N.Y.S.2d 764, and this case does not even involve the issue here which was a defective design situation.

Here defendant State admits the evidence indicates that its original and revised design specifications were defective, similar to the cases set forth in United States v. Spearin (1918), 248 U.S. 132, 136, 39 S.Ct. 59, 63 L.ed. 166, wherein the Court declared:

> ". . . if a contractor is bound to build according to the plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans or specifications . . . This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work . . ." (Citations omitted.)

We find sufficient evidence under any one of several theories to support the findings of the jury for plaintiff on this issue.

## Issue 8

Did the District Court err by admitting plaintiff's Exhibit Nos. 119, 131, and 141 in evidence?

Principally the State argues that the exhibits were improperly admitted over the State's continuing objections, citing section 93-401-12, R.C.M. 1947, which provides:

> "There can be no evidence of the contents of a writing, other than the writing itself, except in the following cases:
>
> ". . .
>
> "5. When the original consists of numerous accounts or other documents, which cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole."

The State continues to argue that Rule 1006, Mont.R.Evid., has superseded this section since the date of trial. However, since that rule does not purport to change existing law, an examination of Rule 1006 would provide some insight into section 93-401-12(5). Rule 1006 provides:

> "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court."

Considering the above the State argues that it has always been recognized that summaries may be based on documents which are themselves competent as evidence and which are made accessible to the opposing party so that the correctness of the summary may be tested on cross-examination.

McCollum v. O'Neil (1954), 128 Mont. 584, 281 P.2d 493; State v. Keneally (1963), 142 Mont. 256, 384 P.2d 770; 29 Am.Jur.2d Evidence §458.

The three exhibits objected to, Nos. 119, 131, and 141, are preliminary and final cost reports setting forth the job costs of the project, including detailed unit costs of material, labor, and equipment attributable to each bid item or work item for the project. Exhibit 131 was the 22nd edition of a book published by the Associated Equipment Distributors listing types of construction equipment and their respective average rental rates. This book is recognized by the construction industry as one of the standard works for equipment rental rates and is also accepted as a guide by federal and state agencies in showing the cost of various types of equipment. The evidence indicated that plaintiff maintained the records of all of the actual equipment ownership costs on the company-wide, annual construction basis. Such records and supporting documentation were made available prior to and during trial for inspection and examination by defendant. Specific equipment, type of work performed, and the period of time each worked on the project were included.

Further, it was indicated that it was not the company's policy to prepare individual records of the equipment ownership cost for each specific item of equipment because it was not economically feasible or practical to make such record. To determine the equipment ownership costs for each project, the company developed a certain procedure and criteria, based on its experience and knowledge, for properly allocating total equipment membership costs uniformly among each of its jobs. This procedure was used on the Sidney job, and

Mr. Olander, the cost accountant for plaintiff, determined that the proper equipment membership costs for each item of equipment was equal to 80 percent of the A.E.D. rate listed in Exhibit 131.

The above method, as testified to by Mr. Olander, was not represented nor used as the actual equipment ownership cost rates, but rather as a method to aid in analyzing the relative and comparative values of the various items of equipment. For instance, the A.E.D. book did not list trucks, and Mr. Olander calculated the fair rental rate based on his construction knowledge and experience and applied an 80 percent factor to this rate to be consistent with the company's procedure and criteria. In determining the factor as 80 percent A.E.D. rate, Mr. Olander testified that he then applied this factor to the hours worked by each item of equipment on the Sidney project to obtain the proper allocations of equipment ownership costs to the project. This procedure and this criteria have been used by plaintiff as a regular practice for many years prior to, during, and after the Sidney project and has proven satisfactory in the company's operation.

As previously noted, the State argues that the cost reports are summaries reflecting total equipment hours on all plaintiff's projects, but the records of such total equipment hours were no longer available. However, the records show that these cost reports are summaries of the total equipment hours "on the Sidney project only", not on all projects, as argued by the State. The Sidney equipment time reports were available to the State. The jury accepted the testimony of Mr. Olander and gave credibility to the policy of the company and the procedures it used in allo-

cating the equipment ownership costs. Therefore, we find defendant's argument and citations not applicable and the exhibits properly admitted.

## Issue 9

Did the District Court err by refusing to admit defendant's exhibit 555 in evidence?

In support of its position plaintiff cites Shechter v. Brewer (Mo. 1961), 344 S.W.2d 784, 789, where the court was faced with a very similar situation. There the court of appeals ruled that no error had been committed by the court in not allowing such an exhibit to be put in, noting:

> "Whether the claim was contradictory would depend upon (1) an interpretation of the Federal tax laws and regulations, and (2) the understanding placed upon those laws and regulations by Nathan Shecter . . . it is apparent that if the trial court had permitted the jury to be informed of the claim, an entire new controversy then arose . . .
>
> "The law has wisely invested the trial court the discretion to deal with these situations. 'If evidence pertaining to collateral matters brings into the case a new controversial matter which would result in confusion of the issues, constitute unfair surprise or cause prejudice wholly disproportionate to the value and usefulness of the offered evidence, it should be excluded.' Conley v. Kaney, Mo.Sup., 250 S.W.2d 350, 353; Jones v. Terminal Railroad Association of St. Louis, Mo.Sup., 242 S.W.2d 473; McComb v. Vaughan, 358 Mo. 915, 218 S.W.2d 548; Wigmore, Evidence, p. 458."

Here, defendant State had the opportunity to review Sornsin's daily time sheets and payroll records for the project, and to cross-examine the plaintiff and its witnesses regarding these documents. We find it was unnecessary and would have been improper to have admitted Exhibit 555 which would have brought controversial matters into the case and could have resulted in the confusion of issues and caused prejudice to the case.

-21-

Issue 10

This issue is directed to whether the verdict and the judgment are supported by the evidence. As set forth in the discussion of the above nine issues considered by this Court, we sustain the findings of the jury and the judgment on all issues with the exception of the fourth issue which relates to the riprap, an item amounting to $21,295.

The judgment of the trial court is affirmed with the one exception, and the matter is remanded to the trial court for correction and compliance with this opinion. Costs to plaintiff.

John Conway Harrison
Justice

We Concur:

Frank I. Haswell
Chief Justice

Gene B Daly

Daniel J. Shea

John C. Sheehy
Justices